UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PRESTON HOLLOW CAPITAL LLC,

                         Plaintiff,                        20-cv-5597 (PKC)

      -against-                               OPINION
                                               AND ORDER

NUVEEN LLC, NUVEEN INVESTMENTS,
INC., NUVEEN SECURITIES LLC, NUVEEN
ASSET MANAGEMENT LLC, and JOHN V.
MILLER,

                         Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        This action is brought under section 1 of the Sherman Act by plaintiff Preston

Hollow Capital LLC ("Preston Hollow") who alleges that defendant Nuveen Asset Management

LLC ("Nuveen") conspired with financial institutions to restrain trade in the high-yield segment

of the municipal bond market.[1]  Preston Hollow describes itself as a "burgeoning contender in

the high-yield municipal bond market."  Preston Hollow raises capital from equity investors,

which it uses to fund purchases of municipal bonds.  Nuveen is characterized as one of the

world's largest institutional investors in municipal bonds; it buys bonds principally for placement

in mutual funds which, in turn, are sold to customers.

        In a public offering, issuers of municipal bonds, such as cities or counties,

typically enter into an arrangement with one or more financial institutions to act as underwriters

of the bonds.  These underwriters are buyers of the newly issued bonds from the issuer and then,

in their capacity as broker-dealers, are sellers of the bonds into a market with many purchasers,

---

[1] By letter dated August 2, 2021 (Doc 41), plaintiff has agreed to dismiss without prejudice Nuveen LLC, Nuveen
Investments, Inc. and Nuveen Securities LLC.

including Preston Hollow and Nuveen.  For purposes of this Opinion and Order, the Court will refer to a financial institution who acts as both an underwriter and broker-dealer in the high-yield municipal bond market as a "UBD."

Preston Hollow has adopted a business model in which it seeks to purchase 100% of an issuance from the UBDs for a particular issue.  This business model would mean that Nuveen would be unable to purchase a particular issue of a high yield municipal bond from the UBDs.  This, according to the Complaint, was not to Nuveen's liking and it allegedly set out to induce UBDs not to sell out the entirety of an issue to Preston Hollow under the threat that, if it did so, Nuveen would not do business with them.  The Complaint describes this as organizing a group boycott of Preston Hollow.  As a result of Nuveen's conduct, Preston Hollow asserts that it has suffered approximately $100 million in damages.

In February 2019, Preston Hollow sought injunctive relief in the Delaware Court of Chancery based largely on the same underlying conduct alleged in this action.  After a full trial on the merits, the Delaware court held that Nuveen was liable for tortious interference with Preston Hollow's business relations but declined to enter a permanent injunction finding that there was not a risk of future harm.

In this action, Preston Hollow asserts that Nuveen's conduct constituted a conspiracy to restrain trade in violation of section 1 of the Sherman Act under either the per se rule or the rule of reason.  It also brings those same claims against Nuveen under New York's Donnelly Act.  Additionally, Preston Hollow asserts a claim of tortious interference with prospective business relations against defendant John Miller, the head of Nuveen's municipal bond department.  Nuveen moves to dismiss the Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  It urges that certain claims are barred by res judicata or under principles of judicial

estoppel and that the Sherman Act and Donnelly Act claims fail to state either a <u>per se</u> or rule of reason claim.  For reasons to be explained, Nuveen's motion will be denied.

BACKGROUND

        A.   <u>The Municipal Bond Market.</u>

        Preston Hollow and Nuveen are competitors in the "high-yield" segment of the municipal bond market.  (Compl. ¶ 2).  Municipal bonds are debt securities issued by cities, states and other governmental or non-profit entities.  (Compl. ¶ 19).  These entities utilize municipal bonds to fund both day-to-day obligations and finance specific projects such as building a school.  (Compl. ¶ 19).  Interest paid to investors on the bonds is generally exempt from federal taxes and sometimes exempt from state taxes.  (Compl. ¶ 19).

        Although the Complaint at times conflates the terms "underwriter," "investment banker," and "broker-dealer," it asserts that these are roles all occupied by a group of large financial institutions or UBDs.  (Compl. ¶¶ 28, 39–40).  But of key importance for purposes of the present motion, neither Preston Hollow nor Nuveen are alleged to have acted as an "underwriter," "investment banker," or "broker-dealer" in connection with a municipal bond offering that is the subject of this Complaint.  (Compl. ¶¶ 35, 40, 43; July 27, 2021 Oral Argument Transcript ("Oral Argument Tr.") at 3, 7).  Preston Hollow and Nuveen compete with each other for inventory of newly issued municipal bonds obtained from UBDs.  (Compl. ¶ 2) (". . . Preston Hollow poses a direct threat to Nuveen's ability to buy sufficient high yield municipal bonds to satisfy market demand when there are cash inflows to its funds."); (Compl. ¶ 3) (Nuveen's actions were "intended to impair Preston Hollow's ability to compete against Nuveen for investment opportunities in the high yield municipal bond market . . . .").

Preston Hollow describes its business model as focusing on "limited public offerings," in which an issuer negotiates exclusively with one or a small group of investors to buy all or a significant amount of the offering.  (Compl. ¶ 26).  This type of transaction, it alleges, provides the certainty of a private offering without eliminating the role of the UBDs, who conduct due diligence on the issuer and its offering.  (Compl. ¶ 26).  The Complaint asserts that limited public offerings generally involve bonds with more risk and higher yields than those issued through a conventional public offering, i.e., where a more broad-based group of investors participate.  (Compl. ¶ 26).

### B.   The Parties and Their Roles in the Municipal Bond Market.

Preston Hollow was founded in 2014 and currently has approximately $2 billion in assets and $1.5 billion in equity capital.  (Compl. ¶ 30).  Preston Hollow is a "permanent capital vehicle" with an alleged stable funding source that acts to insulate the firm from downturns in the municipal bond market.  (Compl. ¶ 32).

Preston Hollow principally invests in "100% placements" a type of limited public offering, where Preston Hollow originates, structures and purchases 100% of the municipal bonds offered through negotiated agreements with issuers and underwriters.  (Compl. ¶ 31).  Preston Hollow, the underwriters, and the issuers agree on the interest rate, term of repayment and structure.  (Compl. ¶ 34).  According to the Complaint, 100% placements "provide issuers with the benefit of Preston Hollow's sector expertise, including flexible and customized solutions that meet an issuer's specific needs."  (Compl. ¶ 31).  Preston Hollow's 100% placements frequently require the firm to perform a detailed credit analysis of the issuer. (Compl. ¶ 34).

Preston Hollow's primary lender is Deutsche Bank, who provides financing to Preston Hollow to fund purchases of municipal bonds. (Compl. ¶¶ 25, 40). For purposes of the municipal bond offerings that are the subject of this Complaint, Deutsche Bank is not considered a UBD. (Oral Argument Tr. at 7–9). The Complaint alleges that Preston Hollow's ability to transact in high-yield municipal bonds would be "significantly impaired" without a financing arrangement. (Compl. ¶ 43).

Nuveen is the largest manager of high-yield municipal bond mutual funds in the United States. (Compl. ¶ 52). It manages $160 billion in total municipal bond assets, including $27 billion in high-yield municipal bond funds. (Compl. ¶ 51). Preston Hollow alleges that Nuveen is one of the largest trading partners for "top-tier" UBDs and does in excess of $13 billion "in business" with the nine leading UBDs. (Compl. ¶ 56).

Nuveen's municipal bond department is led by defendant John Miller, who is the head of municipals and a member of Nuveen's Global Investment Committee. (Compl. ¶¶ 18, 53). Miller manages Karen Davern, Nuveen's head municipal trader, and Steve Hlavin, a portfolio manager at Nuveen. (Compl. ¶ 53).

The Complaint alleges that in contrast to Preston Hollow's "permanent capital" financing, Nuveen is principally a mutual fund manager. The "mutual fund model" requires the fund manager to distribute cash when an investor sells shares in the fund, causing an "outflow," and purchase municipal bonds when an investor buys shares, causing an "inflow." (Compl. ¶ 54). To meet the demand from investor inflows, the Complaint alleges that Nuveen purchases municipal bonds from UBDs who offer the municipal bonds to investors for the first time. (Compl. ¶ 55) ("When Preston Hollow conducts 100% placements, it funds the entire issuance

and, consequently, Nuveen cannot purchase any of the bonds. This lessens Nuveen's ability to meet market demand because it diminishes the array of purchase options available to it.").

C.  The Alleged Boycott of Preston Hollow.

Starting in early 2017, Preston Hollow heard from various municipal bond market participants that Nuveen was taking an "aggressive posture towards institutions who were conducting business with Preston Hollow."  (Compl. ¶ 59).  The Complaint alleges that Nuveen's actions against Preston Hollow peaked in late 2018 after Preston Hollow invested in 100% placements of issuers Howard University and Roosevelt University.  (Compl. ¶¶ 59–60). Because the Howard University and Roosevelt University bonds were 100% placements, Nuveen was not able to purchase any of the bonds.  (Compl. ¶ 66).

Prior to December 2018, the Complaint alleges that Nuveen would punish UBDs that worked with Preston Hollow by putting them "in the box."  (Compl. ¶ 68).  Preston Hollow alleges that Nuveen puts a UBD "in the box"—a temporary halt to business—to express displeasure and induce the UBD to cease doing business with Preston Hollow.  (Compl. ¶ 29).

Between November 2018 and February 2019, in response to Preston Hollow's transactions with Roosevelt University and Howard University, the Complaint alleges that Nuveen sought agreement from UBDs and Deutsche Bank to stop working with Preston Hollow on 100% placements.  (See, e.g., Compl. ¶¶ 3, 74).  During this period, Preston Hollow alleges that a series of phone calls and communications occurred between Nuveen and nine UBDs: Wells Fargo, Goldman Sachs, Morgan Stanley, RBC, Bank of America, JPMorgan, Mesirow, Stifel and KeyBanc.  Nuveen also had communications with Deutsche Bank.  The Calls with Deutsche Bank, Goldman Sachs and Morgan Stanley were recorded.  (Compl. ¶¶ 5, 93, 98, 113).

The Complaint alleges that due to Nuveen's conduct, most of the leading UBDs have stopped working with Preston Hollow on 100% placements or will only do so if Preston Hollow originates the transaction.  (Compl. ¶ 205).  The Court discusses the alleged communications with Deutsche Bank and each UBD below.

i.   Deutsche Bank

 On December 20, 2018, Miller, the Head of Municipals at Nuveen, allegedly learned about the closing of the Howard University offering.  (Compl. ¶ 73).  That morning, the Complaint alleges that Miller instructed his subordinates at Nuveen that if Deutsche Bank provided financing to Preston Hollow for this transaction, "we will be taking our business to zero with them as soon as practicable."  (Compl. ¶ 75).  Hlavin then called Deutsche Bank and allegedly demanded that it stop financing Preston Hollow transactions or face retaliation from Nuveen.  (Compl. ¶¶ 76–77).  The Complaint quotes Hlavin as stating that Miller directed Nuveen's financing business with Deutsche Bank be reduced "to zero'" because Nuveen "need[s] to make a very clear and consistent stance that we are not going to be doing business with anyone who chooses to support this kind of activity [business with Preston Hollow] in the market."  (Compl. ¶ 77 (second alteration in original)).  The Complaint alleges that Hlavin made statements to Deutsche Bank including that "everything is going to get back to" Nuveen, other Nuveen employees are having "the same conversation" with Nuveen's top 20 dealers, and that Nuveen will have a "'consistent stance' across all dealers" where it will not "'do business with anyone who supports [Preston Hollow].'"  (Compl. ¶¶ 79–81).

The Complaint alleges that Miller followed up with Deutsche Bank the next day. Miller allegedly told Deutsche Bank that he had evidence of wrongdoing by Preston Hollow and "'firm commitments' from Wells Fargo, Bank of America, Goldman, and JPMorgan that 'they'll

never do business with Preston Hollow again.'"  (Compl. ¶ 82).  Additionally, Miller allegedly

told Deutsche Bank that he was trying to cut off Preston Hollow's financing from all sources.

(Compl. ¶¶ 86–87).  It alleges that Miller was no longer going to punish UBDs and lenders for

working with Preston Hollow after the fact, but seeking "'partners who have promised me they

will show me everything' and who are 'all on board with our procedures on a going forward

basis.'"  (Compl. ¶ 90).

As a "first round" of penalties, the Complaint alleges that Miller told Deutsche

Bank that he was removing $300 million of financing business and implied that additional

measures would not be needed if Deutsche Bank stopped doing business with Preston Hollow.

(Compl. ¶ 84).  In January 2019, Miller met with Deutsche Bank employees who told Miller that

Deutsche Bank's legal and compliance groups believed that Nuveen's requests regarding Preston

Hollow were illegal.  (Compl. ¶ 94).  By the time of the trial in the Court of Chancery, Preston

Hollow alleges that Nuveen reduced its financing arrangements with Deutsche Bank by

approximately $1 billion.  (Compl. ¶ 85).

ii.    Wells Fargo

In November 2018, Wells Fargo served as the UBD on the Roosevelt University

offering.  (Compl. ¶ 63).  Thereafter, Nuveen allegedly refused to trade high-yield municipal

bonds with Wells Fargo.  (Compl. ¶ 69).  On November 19, 2018, Nuveen and Wells Fargo had a

meeting where Wells Fargo agreed not to do 100% placements with Preston Hollow and that

"Nuveen would see every deal."  (Compl. ¶ 70).  The Complaint alleges that Nuveen resumed

trading with Wells Fargo and assured Wells Fargo that other UBDs would be punished for

working with Preston Hollow.  (Compl. ¶ 72).

iii.   <u>Goldman Sachs</u>

On December 21, 2018, Preston Hollow alleges that Miller called the head of municipal bond sales at Goldman Sachs.  (Compl. ¶ 98).  The Complaint alleges that Miller noted Preston Hollow's "growth and the infringement on issuers that you and I would be trading right now if those issuers weren't falling for these predatory practices."  (Compl. ¶ 99).  Miller allegedly explained that instead of putting UBDs "in the box," he was "doing a gating item for my counterparties . . . . And that is to be a partner with Nuveen, and I need you on my team, you can't do any of this private bullshit business with Preston Hollow."  (Compl. ¶ 100 (alteration in original)).  Moreover, the Complaint quotes Miller as stating UBDs had to "choose who you want to do business with" between Preston Hollow and Nuveen.  (Compl. ¶¶ 101–102).  Miller allegedly told Goldman Sachs that he had "five dealers so far . . . and I'm going to try and get more."  (Compl. ¶ 103 (alteration in original)).  The Complaint alleges that Miller held a second meeting with Goldman Sachs on January 22, 2019 where he again threatened to cut off business if Goldman Sachs continued working with Preston Hollow.  (Compl. ¶¶ 106–07).

The Complaint alleges that in late 2018 Goldman Sachs and Preston Hollow were discussing twelve potential transactions.  (Compl. ¶ 105).  It alleges that following the communications with Miller, Goldman Sachs told Preston Hollow that it was working on a "matrix" regarding what transactions it could pursue with Preston Hollow and would not participate in any transactions that affected a public bondholder like Nuveen.  (Compl. ¶ 108). Goldman Sachs did not move forward on any of the twelve transactions and Preston Hollow has not since received any meaningful inquiries from Goldman Sachs on other potential transactions. (Compl. ¶¶ 109–11).

iv.  <u>Morgan Stanley</u>

On December 20, 2018, Davern had two calls with the head of municipal securities trading at Morgan Stanley.  (Compl. ¶ 113).  Davern allegedly stated that she heard from Bank of America that Morgan Stanley was working on a large transaction with Preston Hollow and told Morgan Stanley that it was getting put "in the box."  (Compl. ¶ 114).  The Complaint alleges Davern stated that Preston Hollow was "going and sourcing muni debt that is being removed from our ability to buy it," that Miller was "building a book of dealers that are not going to do this type of business" with Preston Hollow and that Nuveen's actions were "uniform across the street."  (Compl. ¶¶ 115–17).

Preston Hollow alleges that an additional conversation occurred between Miller and Morgan Stanley's head of municipal securities over the December 2018 holidays that was not recorded.  (Compl. ¶ 120).  It further asserts that by the start of 2019, Morgan Stanley was out of the "box" with Nuveen.  (Compl. ¶ 121).  Previously, in 2017 and 2018, Morgan Stanley worked with Preston Hollow on 100% placements, and in December 2018, was in the process of underwriting another 100% placement.  (Compl. ¶ 112).  The Complaint alleges that since December 2018 Morgan Stanley has not worked with Preston Hollow on any 100% placements. (Compl. ¶ 122).

v.  <u>Other UBDs</u>

The Complaint alleges that Miller and Davern called RBC's municipal bond representatives on January 9 and 11, 2019.  (Compl. ¶ 123).  Davern allegedly told RBC that Miller had been talking to the major UBDs about Preston Hollow's business and that Nuveen "turned around several dealers" who agreed to stop doing business with Preston Hollow. (Compl. ¶ 124).  Following this call, the Complaint alleges that RBC has not worked with

Preston Hollow on any 100% placements and has also "policed" other UBDs by telling Nuveen when they are working on 100% placements with Preston Hollow.  (Compl. ¶¶ 125–126).

On December 20, 2018, Preston Hollow alleges that Davern called Bank of America and put it "in the box" for underwriting the Howard University bond transaction. (Compl. ¶ 128).  That same day, the Complaint alleges that Miller communicated with Bank of America's head of institutional municipal bond sales and asked him not to do 100% placements with Preston Hollow.  (Compl. ¶ 129).  The Complaint alleges that Bank of America agreed to Miller's request the next day.  (Compl. ¶ 130).  It further asserts that the head of municipal bond sales at Bank of America later informed two Preston Hollow representatives that the decision not to do 100% placements with Preston Hollow was due to pressure from Nuveen.  (Compl. ¶ 131).

During this period, the Complaint alleges that Miller called JPMorgan, who agreed not to do 100% placements with Preston Hollow.  (Compl. ¶¶ 133–134).  It alleges that JPMorgan was previously interested in expanding its business with Preston Hollow, including JPMorgan underwriting a second potential Howard University bond offering.  (Compl. ¶ 136). However, when Preston Hollow contacted JPMorgan in early 2019 about participating in the offering, JP Morgan allegedly was non-responsive for several weeks before stating that it did not have time to secure the necessary internal approvals.  (Compl. ¶ 138).  Preston Hollow responded that it would give JPMorgan as much time as it needed, but JPMorgan declined to pursue it further.  (Compl. ¶ 138).

Preston Hollow alleges that it was working on six transactions with Mesirow in late December 2018 but that after communications with Miller, Mesirow has refused to work with Preston Hollow.  (Compl. ¶ 140).  The Complaint alleges that Hlavin later bragged to

Deutsche Bank that Nuveen was responsible for Mesirow stopping its business with Preston

Hollow.  (Compl. ¶ 141).

Preston Hollow asserts that prior to December 2018, it had worked with Stifel on

several 100% placements.  (Compl. ¶ 144).  The Complaint alleges that in late 2018, Stifel

stopped doing these transactions with Preston Hollow because it was enforcing an informal pre-

existing policy not to originate 100% placements.  (Compl. ¶ 146).  Stifel has subsequently

served as the UBD on deals that Preston Hollow originates but will not approach Preston Hollow

with potential transactions.  (Compl. ¶ 149).  Moreover, Stifel allegedly told Preston Hollow that

it promised to show Nuveen any potential 100% placement first.  (Compl. ¶ 147).

Prior to December 2018, Keybanc acted as the UBD on four 100% placements

with Preston Hollow.  (Compl. ¶ 151).  The Complaint alleges that in April 2018 Keybanc was

placed "in the box" by Nuveen, who withdrew its business from the firm.  (Compl. ¶¶ 152–53).

Due to Nuveen's conduct, the Complaint alleges that Keybanc now shows every potential 100%

placement to Nuveen first and will not originate 100% placements with Preston Hollow.

(Compl. ¶¶ 154–55).

D.  The Delaware Chancery Court Action.

On January 15, 2019, Preston Hollow sent a cease-and-desist letter to Nuveen

demanding that it stop engaging in alleged unlawful communications, undertake an internal

investigation into past communications, take measures to undo the harm caused by its actions

and agree to adopt supervisory procedures to prevent similar conduct in the future.  (Compl. ¶

200).

On February 22, 2019, Nuveen sent a letter to Deutsche Bank and each of the

UBDs that it communicated with about Preston Hollow.  (Compl. ¶ 201).  In the letter, Nuveen

acknowledged that certain discussions occurred that might have included Preston Hollow but stated that it was not seeking any "agreement or commitment from your firm regarding Preston Hollow." (Compl. ¶ 201).  Nuveen also stated that it reserved the right to conduct trading business within its lawful discretion and express its views on trading activities. (Compl. ¶ 201).

On February 28, 2019, Preston Hollow filed suit against the four Nuveen defendants in the Delaware Court of Chancery.  Miller was not a party to the action.  Preston Hollow asserted four claims based on essentially the same underlying conduct alleged in this Action.  Preston Hollow Capital LLC v. Nuveen LLC, 2020 WL 1814756, at *11–12 (Del. Ch. Apr. 9, 2020) ("Nuveen I").  The Court of Chancery dismissed Preston Hollow's claims for tortious interference with contract and defamation.[2]

On March 14, 2019, the Court of Chancery granted Preston Hollow's motion to expedite but denied its motion for preliminary injunctive relief.  In July 2019, a trial was held on Preston Hollow's tortious interference of prospective business relations and Donnelly Act claims.  Preston Hollow sought only permanent injunctive relief and did not seek damages.

The Court of Chancery issued its post-trial memorandum opinion in Nuveen I on April 9, 2020.  It held that Nuveen was liable for tortious interference with business relations based on its conduct towards Goldman Sachs, JPMorgan, KeyBanc, Mesirow, Stifel and Wells Fargo.  Nuveen I, 2020 WL 1814756, at *19.  The Court did not reach the issue of Nuveen's liability under the Donnelly Act.  Ultimately, the Court of Chancery denied Preston Hollow's

---

[2] Preston Hollow was granted leave to re-file its defamation claim in Delaware Superior Court, and that action remains ongoing.  Preston Hollow Capital LLC v. Nuveen LLC, Docket No. N19C-10-107-MMJ.  On December 15, 2020, the Superior Court of Delaware granted in part and denied in part Preston Hollow's motion for summary judgment on its defamation claim.  Preston Hollow Capital LLC v. Nuveen LLC, 2020 WL 7365808 (Del Sup. Dec. 15, 2020).  It concluded that collateral estoppel applied to bar certain statements that formed the basis of Preston Hollow's defamation claim but denied summary judgment as to other statements.  Id. at *12–13.

request for a permanent injunction.  Id. at *21–22.  It found that Nuveen's conduct was not

ongoing and that it was unlikely Nuveen would repeat its tortious behavior.  Id.

Following the conclusion of the proceedings in the Delaware Court of Chancery,

Preston Hollow filed the action in this Court on July 20, 2020.  (Doc 1).

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a

court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the Court must

examine only the well-pleaded factual allegations, if any, "and then determine whether they

plausibly give rise to an entitlement to relief."  Id. at 679.  The Complaint must include non-

conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to

plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).  "Dismissal is appropriate when 'it

is clear from the face of the complaint, and matters of which the court may take judicial notice,

that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche

Auto. Holdings SE, 763 F.3d 198, 208–09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l,

231 F.3d 82, 86 (2d Cir. 2000)).

In briefing the motion to dismiss, both parties submitted declarations with exhibits

that included filings, court transcripts and trial exhibits from Nuveen I.  (Cole Decl. Exs. 1–13,

Doc 33; Thompson Decl. Exs. 3–7, Doc 35; Cole Reply Decl. Exs. 15–22, Doc 37).  On a motion

to dismiss, the Court may take judicial notice of relevant matters of public record but only for

limited purposes.  Kramer v. Time Warner Inc., 937 F.2d 767, 773–74 (2d Cir. 1991); accord

<u>Giraldo v. Kessler</u>, 694 F.3d 161, 164 (2d Cir. 2012).   "'A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"   <u>Global Network Commc'ns Inc. v. City of New York</u>, 458 F.3d 150, 157 (2d Cir. 2006) (quoting <u>Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.</u>, 146 F.3d 66, 70 (2d Cir. 1998)).

       The documents from the Delaware action are primarily offered in connection with Nuveen's res judicata and judicial estoppel arguments.   The Court may consider such defenses on a motion to dismiss under Rule 12(b)(6) where the basis of the defense is set forth on the face of the "complaint, documents attached or incorporated therein, and matters appropriate for judicial notice."   <u>TechnoMarine SA v. Giftports, Inc.</u>, 758 F.3d 493, 498–99 (2d Cir. 2014); <u>Julian v. Metro. Life Ins. Co.</u>, 17 cv 957 (AJN), 2021 WL 1226749, at *3 (S.D.N.Y. Mar. 31, 2021) ("A party may raise a defense of res judicata, collateral estoppel, or judicial estoppel on a motion to dismiss pursuant to Rule 12(b)(6) where the basis for that defense is set forth on the face of the complaint or established by public record." (quoting <u>Evercrete Corp. v. H-Cap Ltd.</u>, 429 F. Supp. 2d 612, 620 (S.D.N.Y. Apr. 27, 2006) (collecting cases))).

DISCUSSION

    I.   <u>Res Judicata</u>

       Defendants urges that Preston Hollow's Donnelly Act claims against Nuveen and tortious interference with prospective business relations claim against Miller are barred by res judicata.   The Court will apply Delaware law to determine the preclusive effect of the Delaware Court's judgment in <u>Nuveen I</u>.   <u>AmBase Corp. v. City Investing Co. Liquidating Tr.</u>, 326 F.3d 63, 72 (2d Cir. 2003) ("Where there is a final state court judgment, a federal court looks to the state's rules of res judicata to determine the prelusive effect of that judgment.").

As an initial matter, the parties agree that Preston Hollow's Sherman Act claims are not precluded because Delaware law recognizes that a state court judgment will not bar the subsequent assertion of a claim over which federal courts have exclusive jurisdiction.  Seagoing Uniform Corp. v. Texaco, Inc., 705 F. Supp. 918, 921 (S.D.N.Y. 1989) ("Under Delaware law, the jurisdictional competence exception to res judicata should permit the subsequent assertion of the federal claims here."); see 28 U.S.C. § 1337(a) (providing that federal courts have exclusive jurisdiction over federal antitrust claims).

Under Delaware law, res judicata requires that "(1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the appellants in the case at bar; and (5) the decree in the prior action was a final decree."  RBC Cap. Markets, LLC v. Educ. Loan Tr. IV, 87 A.3d 632, 643 (Del. 2014). "Delaware, like the federal courts, follows a transactional approach to res judicata,"  LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 193 (Del. 2009), which requires that the party asserting the defense show that the "[t]wo claims 'derive[d] from a common nucleus of operative fact[s] . . . .'"  Id. (quoting Maldonado v. Flynn, 417 A.2d 378, 383 (Del. Ch. 1980)).  Moreover, "[t]he rule against claim splitting . . . require[s] a plaintiff to present in one action all of his theories of recovery relating to a transaction" and does not permit "overlapping or repetitive actions in different courts or at different times."  Maldonado, 417 A.2d at 382.

A. <u>Preston Hollow's Donnelly Act Claims Are Not Barred by Res Judicata.</u>

Nuveen urges that a straightforward application of the rule against claim splitting bars Preston Hollow from bringing its Donnelly Act claims for a second time in this Action.  The

Delaware court had subject matter jurisdiction over the claims in Nuveen I, the parties are the same with respect to the Donnelly Act claims and a final judgment was issued.  The parties do not dispute that the claims brought by Preston Hollow in this Action are based on the same conduct as those in Nuveen I.

In Nuveen I, the Delaware court expressly declined to determine whether injunctive relief was appropriate in a private action under the Donnelly Act because it would require consideration of "an ambiguous question of New York law" and "Delaware has a policy against innovating in sister-states' laws."  Nuveen I, 2020 WL 1814756 at *19–20.  The Court of Chancery therefore held that "[d]eclining to make a determination on this count moots the issue of Nuveen's liability under the Donnelly Act for the purposes of this litigation."  Id.  In the Final Order and Judgment entered by Vice Chancellor Sam Glasscock in Nuveen I, it states that "[t]he Court declines to rule on Count III, violation of New York State's Donnelly Act."  (Thompson Decl. Ex. 4 ¶ 2).

Nuveen points to no Delaware precedent that would preclude the assertion of a claim in the court of a sister state which the court in the first state declined to adjudicate because it raised novel issues under that sister state's laws.  Rather, application of Delaware's rule against claim splitting on these facts runs contrary to the rule's purpose, which is "founded upon the principle that no person should be unnecessarily harassed with a multiplicity of suits" and is "designed to prevent a litigant from getting two bites at the apple."  Goureau v. Lemonis, 2021 WL 1197531, at *8 (Del. Ch. Mar. 30, 2021) (internal quotation marks omitted) (quoting J.L. v. Barnes, 33 A.3d 902, 918 (Del. Super. Ct. 2011)); Markusic v. Blum, 2021 WL 2456637, at *6 (Del. Ch. June 16, 2021) ("In any event, the 'main purpose of the general rule [against claim splitting] . . . is to protect the defendant from being harassed by repetitive actions based on the

same claim.'" (alterations in original) (quoting Restatement (Second) of Judgments § 26 cmt. a)). The Chancery Court's eminently reasonable decision not to weigh in on novel issues under New York law meant that Preston Hollow did not have the first "bite at the apple." Preston Hollow's decision to reassert the Donnelly Act claims in this Court was neither done to harass Nuveen nor to give it a second "bite at the apple."

Principles of equity, as well as the non-application of res judicata in other contexts where courts decline to rule on the merits, weigh in favor of permitting Preston Hollow to reassert its Donnelly Act claims. For instance, res judicata does not apply when a federal court declines to exercise supplemental jurisdiction or dismisses a claim on grounds of abstention. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); Am. Trial Lawyers. Ass'n, New Jersey Branch v. New Jersey Supreme Ct., 409 U.S. 467, 469 (1973) ("For that reason, we have held that a dismissal on grounds of abstention so as to permit a state court to pass on an issue of state law must not be with prejudice.").

The Court concludes that the application of Delaware's doctrine of res judicata would not bar Preston Hollow's Donnelly Act claim in this Court.[3]

### B.  Preston Hollow's Claim Against Miller Is Not Barred by Res Judicata.

Miller urges that Preston Hollow's tortious interference with prospective business relations claim against him should be dismissed on res judicata grounds. The Chancery Court, after a trial on the merits, found Nuveen liable on Preston Hollow's tortious interference with

---

[3] While not material to the Court's decision, the parties agree that Preston Hollow's Donnelly Act claims turn on the outcome of the Sherman Act claims for purposes of this motion.

business relations claim based on its conduct towards certain UBDs.  Miller was not a party in
Nuveen I.  He is head of municipals at Nuveen and a member of its Global Investment
Committee.  (Compl. ¶ 18).  The Complaint alleges that much of the underlying communications
at issue were made by Miller or subordinates acting at his direction.  (See, e.g., Compl. ¶¶ 1, 3, 4,
53, 59, 67–74).  In addition, the Court of Chancery in its findings of fact similarly highlighted
Miller's conduct, as an employee of Nuveen, in finding that his employer was liable.  Nuveen I,
2020 WL 1814756, at *5 ("This dispute, however, largely centers on the time period between
December 2018 and February 2019, when Nuveen employees, led by Miller, held a series of
phone calls and meetings with various [UBDs] as well as with Deutsche Bank.").

　　　　Res judicata does not typically bind nonparties to a judgment.  But there are
exceptions to this rule "in which applying a preclusion doctrine to a nonparty is appropriate, fair
and does not violate the nonparty's due process rights.  When any of these circumstances is
present, the parties are said to be in privity."  Sacerdote v. Cammack Larhette Advisors, LLC,
939 F.3d 498, 506 (2d Cir. 2019).  "In the context of claim preclusion, if a party to an action is
found to be in privity with a party to a previous action, then the privy is bound with respect to all
the issues that were raised or could have been raised in the previous lawsuit."  Id.  (internal
quotation marks omitted).

　　　　There is no claim that the Delaware Court had personal jurisdiction over Miller.
(Oral Argument Tr. 26–29).[4]  Although there are cases in which privity may exist between
employees and their employers for res judicata purposes, the Court declines to preclude Preston

---

[4] Under Delaware Law, certain enumerated officers consent to the exercise of personal jurisdiction "in the Delaware
courts in two classes of cases: (i) 'all civil actions or proceedings brought in this State, by or on behalf of, or against
such corporation, in which such officer is a necessary or proper party'; or (ii) 'any action or proceeding against such
officer for violation of a duty in such capacity.'"  Hazout v. Tsang Mun Ting, 134 A.3d 274, 277 (Del 2016)
(quoting 10 Del. C. § 3114(b)).  Neither party asserts that Miller was subject to personal jurisdiction under the
relevant Delaware statute.

Hollow's claim against Miller.  Application of res judicata, as urged by Miller, would result in the dismissal of the claim against him even though there was no purported basis for the Delaware Court to assert personal jurisdiction over Miller in the first action.  Nuveen fails to identify Delaware claim-splitting precedent that would bar a subsequent claim against a corporate officer who was neither named in the prior action nor could have been involuntarily joined as a party consistent with due process.  Cf. Maldonado, 417 A.2d at 383 ("The rule against claim splitting cannot, however, entirely deny a plaintiff an opportunity to present his facts and theory of recovery.  Therefore, where it appears that a plaintiff could not for jurisdictional reasons have presented his claim in its entirety in a prior adjudication, the rule against claim splitting will not be applied to bar this claim.").

Accordingly, Miller's motion to dismiss the tortious interference claim will be denied.

II.    <u>The Court Declines to Apply Judicial Estoppel Based on Statements Made by Preston Hollow in Nuveen I.</u>

Nuveen contends that based on positions taken by Preston Hollow in <u>Nuveen I</u>, all claims in this Action should be dismissed under principles of judicial estoppel.  In <u>Nuveen I</u>, Preston Hollow only sought injunctive relief.  2020 WL 1814756, at *2 ("However, Preston Hollow expressly *does not* seek damages for its claim of tortious interference, instead, it seeks only equitable relief." (emphasis in original)).  Nuveen urges that representations made by Preston Hollow during the course of <u>Nuveen I</u> regarding its inability to calculate damages bar it from seeking damages in this action.  Specifically, Nuveen argues that Preston Hollow claimed

damages were speculative and unquantifiable in order to establish jurisdiction in the Court of Chancery and gain access to the expedited proceedings available in that court.[5]

Judicial estoppel is a potential consequence of a conflict between two factual positions maintained by the same party.  The purpose of the doctrine is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001) (internal citations and quotation marks omitted).  It "is an equitable doctrine invoked by a court at its discretion," Id. (internal quotation marks omitted); the application of which "will vary based on 'specific factual contexts.'"  Adelphia Recovery Trust v. Goldman, Sachs & Co., 748 F.3d 110, 111 (2d Cir. 2014) (quoting New Hampshire, 532 U.S. at 749–51).

Typically, "[j]udicial estoppel is properly invoked where: (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding."  Ashmore v. CGI Group, Inc., 923 F.3d 260, 272 (2d Cir. 2019).  The Second Circuit also considers whether "the party asserting the two inconsistent positions would derive an unfair advantage against the party seeking estoppel."  Id.  Judicial estoppel only applies "in 'situations where the risk of inconsistent results with its impact on judicial integrity is certain.'"  Chevron Corp. v. Donziger, 833 F.3d 74, 128 (2d Cir. 2016) (quoting Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148 (2d Cir. 2005)).

---

[5] In a Nuveen I motion to dismiss opinion, the Delaware Court of Chancery explained that it "is a court of limited jurisdiction; when addressing a common-law tort, this Court may act only if equity is required in remedy, due to an insufficiency of remedies at law."  Preston Hollow Capital LLC v. Nuveen LLC, 2019 WL 3801471, at *1 (Del. Ch. Aug. 13, 2019).  "Chancery jurisdiction must rest on one of three grounds: equitable action (i.e., fiduciary relationships), equitable remedy, or statutory jurisdiction. . . . Once vested with jurisdiction, Chancery may 'clean up' associated legal matters."  Id. at 1 n.3.

The Court must first consider whether the position advanced by Preston Hollow in

Nuveen I is clearly inconsistent with its claim for damages made in the Complaint.  A court does

not apply judicial estoppel where the "'the statements at issue do not present an irreconcilable

conflict.'"  Donziger, 833 F.3d at 128 (quoting Rodal v. Anesthesia Grp. of Onondaga, P.C., 369

F.3d 113, 119 (2d Cir. 2004)); accord Ashmore, 923 F.3d at 272 ("Moreover, there must be a

true inconsistency between the statements in the two proceedings.  If the statements can be

reconciled there is no occasion to apply an estoppel." (internal quotation marks omitted)).

In support of its judicial estoppel argument, Nuveen points to statements made by

Preston Hollow at various stages of the Delaware litigation.  For instance, Preston Hollow stated

in its proposed findings of fact in Nuveen I that "[t]he dollar amount of the damages to PHC as a

result of Nuveen's misconduct is not susceptible to reasonable calculation."  (Cole Decl. Ex. 6).

Preston Hollow's brief filed in opposition to Nuveen's motion to dismiss stated that:

> [N]either Preston Hollow nor Nuveen can quantify the harm as a result of
> [UBDs] declining to bring opportunities to Preston Hollow's attention
> because, by definition, Preston Hollow will not be aware of those
> opportunities.  Further, the allegations in the Complaint demonstrate that
> Preston Hollow already has been harmed and has a reasonable
> apprehension of future harm to its business from Miller's conduct based
> on statements by [UBDs] that they will not do 100% placements with
> Preston Hollow in the future for which injunctive relief is the appropriate
> remedy, not speculative money damages."

(Cole Decl. Ex. 5 (internal citations omitted)).[6]  Ultimately, after a trial on the merits, the Court

of Chancery noted that "the remedy available was damages," but denied a permanent injunction

---

[6] Nuveen points to additional instances in which Preston Hollow made similar claims.  (Cole Decl. Ex. 3. - motion to expedite ("Attempts to quantify that harm will be both difficult and uncertain, but injunctive relief will preserve Preston Hollow's ability to compete); Ex. 7 - written closing argument ("[T]he fact that the harm is difficult to quantify is precisely why PHC has sought injunctive relief rather than damages and why it is the appropriate remedy here."); Ex. 8 - written rebuttal closing argument ("Identifying and quantifying damages for opportunities that were never brought to PHC's attention as a result of the boycott also would be difficult.").

because "[p]laintiff has shown only past tortious behavior; it has not shown a likelihood of future harm absent injunctive relief." Nuveen I, 2020 WL 1814756, at *20.

Preston Hollow responds that the statements at issue only claimed that the full amount of damages would be speculative at the time of the Court of Chancery litigation, not that it was impossible to calculate any damages in the future. Preston Hollow notes that with "the passage of time and the ability to compare Preston Hollow's 2019 and 2020 results with prior years, it is now possible to make a reasonable calculation of actual damages. . . ." (Pl. Opp. at 25).

The Court concludes that the statements at issue from Nuveen I and Nuveen's request for damages in this action are not clearly inconsistent. "[H]ere, context is particularly important" in deciding whether to apply an estoppel. United States v. Apple, 791 F.3d 290, 337–38 (2d Cir. 2015). The majority of the underlying conduct occurred between December 2018 and January 2019, and the statements at issue in Nuveen I were made by Preston Hollow between March 5, 2019 and September 13, 2019. (Cole Decl. ¶¶ 4–9 (listing dates of relevant filings in the Court of Chancery litigation)). The Court of Chancery's post-trial opinion was issued on April 9, 2020, at which time it concluded there was not a sufficient risk of future harm to enter a permanent injunction. This action was commenced on July 20, 2020. Preston Hollow's "inconsistent statement" in this action is its damages claim in the Complaint, and not a specific representation regarding the factual basis for claiming damages. Although the underlying conduct alleged is the same in both proceedings, intervening events and the time between Preston Hollow's last statement in the Court of Chancery and the filing of its Complaint could bear on its ability to prove damages with reasonable certainty. It is not clearly inconsistent for Preston Hollow to assert that damages would be speculative at the time the statements were

made in <u>Nuveen I</u>, but approximately 18 months after the alleged unlawful conduct had ceased, be in a position to assert a factual basis for damages.  For instance, the Complaint alleges that Preston Hollow has seen a drastic reduction in inquiries and contacts from UBDs starting in January 2019 and that it fell well short of its budgeted originations for 2019.  (Compl. ¶¶ 207–09).

Because the Court concludes that Preston Hollow's statements made in <u>Nuveen I</u> are not "clearly inconsistent" with its current claim for damages, the Court declines to apply judicial estoppel.

### III.   Sherman Act Claims

The Complaint asserts that Nuveen engaged in conduct in violation of Section 1 of the Sherman Act that is unreasonable <u>per se</u> (Count I), or alternatively unlawful under the rule of reason (Count II).  It brings those same claims under the Donnelly Act, and the parties agree that for purposes of this motion, Preston Hollow's Donnelly Act and Sherman Act claims are subject to the same pleading standards.  (Def Mem. at 24 n.16; Pl. Opp. at 19 n.5).

#### A.   Legal Standard.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1.  To state a section 1 claim, a plaintiff must allege: "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade."  <u>Geneva Pharms. Tech. Corp. v. Barr Laboratories Inc.</u>, 386 F.3d 485, 506 (2d Cir. 2004).

"The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."  <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 885 (2007); <u>see also</u> <u>Continental T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 49 (1977)

(the rule-of-reason analysis "weighs all of the circumstances of a case in deciding whether a

restrictive practice should be prohibited as imposing an unreasonable restraint on competition.").

However, "certain business relationships are per se violations of the [Sherman] Act without

regard to a consideration of their reasonableness."  United States v. Topco Assocs., Inc., 405

U.S. 596, 607 (1972).  "Per se treatment is appropriate '[o]nce experience with a particular kind

of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'"

State Oil Co. v. Khan, 522 U.S. 3, 10 (1997) (quoting Arizona v. Maricopa Cty. Med. Soc., 457

U.S. 332, 344 (1982)).  "This per se approach permits categorical judgments with respect to

certain business practices that have proved to be predominantly anticompetitive."  Northwest

Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985); accord

NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998).

Agreements within the scope of section 1 may be "horizontal" which are

"'between competitors at the same level of the market structure,'" or "vertical" which are

"'combinations of persons at different levels of the market structure, e.g., manufacturers and

distributors.'"  Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 182 (2d Cir.

2012) (quoting Topco Associates, 405 U.S. at 608).  "Typically[,] only horizontal restraints . . .

qualify as unreasonable per se."  Ohio v. American Express Co., 138 S. Ct. 2274, 2283–84

(2019) (internal quotation marks omitted).  Vertical restraints are generally subject to the rule of

reason.  Id.

"[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in

which an entity at one level of the market structure, the 'hub,' coordinates an agreement among

competitors at a different level, the 'spokes.'"  Apple, 791 F.3d at 314.  Such hub-and-spoke

conspiracies "consist of both vertical agreements between the hub and each spoke and a

horizontal agreement among the spokes to adhere to the hub's terms, often because the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing." Id. (internal quotation marks and alterations omitted). The Second Circuit has held that "all participants in 'hub-and-spoke' conspiracies [are] liable when the objective of the conspiracy was a per se unreasonable restraint of trade." Id. at 322.

        B.  Framework for Analyzing the Purported Boycott of Preston Hollow.

Preston Hollow purports to allege a per se violation by Nuveen for orchestrating a horizontal agreement among UBDs to boycott 100% placements involving Preston Hollow. (Compl. ¶ 243). Preston Hollow asserts that the alleged conspiracy did not consist solely of a series of vertical restraints between Nuveen and individual UBDs, but also that the UBDs themselves entered into a horizontal agreement to boycott Preston Hollow. (Compl. ¶ 245).

Supreme Court "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." NYNEX, 525 U.S. at 135 (discussing Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959); see also Balaklaw v. Lovell, 14 F.3d 793, 800 (2d Cir. 1994) ("[Boycotts] generally consist of agreements by two or more persons not to do business with other individuals or to do business with them only on specified terms. . . ."). In Klor's, Inc. v. Broadway-Hale Stores, Inc., the Court applied the per se rule to a boycott in which a large retail chain acted in concert with several manufacturers and distributors of a product to not sell that product to plaintiff, a competing retailer, or to sell to it only at discriminatory prices. 359 U.S. at 209. However, the Supreme Court subsequently noted "that Klor's was a case involving not simply a 'vertical' agreement between supplier and customer, but a case that also involved a 'horizontal' agreement among competitors." NYNEX,

525 U.S. at 136.  In <u>NYNEX</u>, the Court concluded that the <u>per se</u> rule did not apply where there was "only a vertical agreement and a vertical restraint," specifically, "a restraint that takes the form of depriving a supplier of a potential customer."  <u>Id.</u>

Based on the allegations in the Complaint, Nuveen and the UBDs who it endeavored to induce not to do business with Preston Hollow operate at different levels of the market structure.  In a high-yield municipal bond offering, an issuer contracts with UBDs to sell the newly issued bonds to investors.  (Compl. ¶¶ 23–24).  Preston Hollow and Nuveen compete with each other to purchase the bonds from the UBDs, who have acquired the bonds from the issuer.  (<u>See, e.g.</u>, Compl. ¶¶ 38–42; 55–56).  In fact, Preston Hollow alleges that its "ability to invest in municipal bonds is highly dependent upon its relationship with [UBDs], since the investment bankers are able to identify which of their issuer clients and transactions will benefit from Preston Hollow's unique positioning and sector expertise."  (Compl. ¶ 38).

Because Nuveen and the UBDs operate at different levels of market structure, to state a <u>per se</u> claim the Complaint must plausibly allege an agreement among the UBDs to boycott 100% placements with Preston Hollow.  <u>See</u> <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 110 (2d Cir. 2002) ("<u>NYNEX</u> . . . squarely held that a horizontal agreement is a prerequisite in a group boycott case.").  This is required even if, as Preston Hollow alleges, Nuveen acted as the "hub" in a hub-and-spoke conspiracy.  (Compl. ¶ 158);  <u>see</u> <u>Apple</u>, 791 F.3d at 314 n.15 ("[T]he 'hub-and-spoke' metaphor is somewhat inaccurate—the plaintiff must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors.");  <u>In re Zinc Antitrust Litig.</u>, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) ("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are

both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other.").

Accordingly, in the case of a hub-and-spoke conspiracy, to be <u>per se</u> unlawful the Complaint must plausibly allege (1) vertical agreements between Nuveen and the individual UBDs, and (2) a horizontal agreement among competitors, i.e. the UBDs.   For reasons to be explained, the Court concludes that the allegations in the Complaint meet this pleading standard.

       C.   <u>The Complaint Plausibly Alleges an Agreement Among Broker-Dealers to Boycott Preston Hollow.</u>

"In order to establish a conspiracy in violation of [section] 1, whether horizontal, vertical, or both, proof of joint or concerted action is required . . . ." <u>Anderson News</u>, 680 F.3d at 183.  "Independent action is not proscribed.  A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." <u>Monsanto Co. v. Spray-Rite Service Corp.</u>, 465 U.S. 752, 761 (1984).

At the pleading stage, the Complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." <u>Twombly</u>, 550 U.S. at 556.  "To survive dismissal, 'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" <u>Gelboim v. Bank of Am. Corp.</u>, 823 F.3d 759, 781 (2d Cir. 2016) (quoting <u>Anderson News</u>, 680 F.3d at 184).  But "a complaint alleging merely parallel conduct is not substantiable." <u>Anderson News</u>, 680 F.3d at 184; <u>accord</u> <u>Twombly</u>, 550 U.S. at 556–57 ("[W]hen allegations of parallel conduct are set out in order to make a [section] 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

A plaintiff may allege direct evidence of an agreement, such as "a recorded phone call in which two competitors agreed to fix prices at a certain level." Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). However, direct evidence is not required. Gelboim, 823 F.3d at 781 ("At the same time, conspiracies are rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." (internal quotation marks omitted)). An agreement may be plausibly inferred with allegations of parallel or interdependent conduct "accompanied by circumstantial evidence and plus factors." Citigroup, 709 F.3d at 136. These plus factors may include, but are not limited to: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Id. (internal quotation marks omitted).

As a preliminary matter, the Complaint alleges facts from which the existence of vertical agreements between Nuveen and individual UBDs may be plausibly inferred. Starting in November 2018, in response to Preston Hollow organizing and investing in two 100% placements, the Complaint alleges that Nuveen initiated a series of communications with leading municipal bond UBDs. During these communications, Nuveen is alleged to have demanded that the UBDs stop underwriting 100% placements with Preston Hollow. The Complaint plausibly alleges that certain UBDs individually agreed to abide by Nuveen terms. Multiple UBDs have stopped underwriting 100% placements with Preston Hollow, ceased discussing potential offerings with Preston Hollow or committed to give Nuveen the opportunity to invest in every

potential 100% placement first.[7]  The non-uniform responses of the UBDs who allegedly participated in the boycott does not undermine Preston Hollow's allegations of parallel conduct. Nuveen's alleged goal in orchestrating the boycott was to gain access to issues of high-yield municipal bond offerings in which Preston Hollow previously would purchase the entirety of such offerings.  The alleged responses of the participating UBDs provided Nuveen with the access it sought.

Moreover, the allegations in the Complaint plausibly support the inference that a horizontal agreement existed between and among the UBDs.  The Complaint alleges that Nuveen employees told individual UBDs and Deutsche Bank that it would stop doing business with the UBDs who continued to underwrite transactions involving Preston Hollow.  (See, e.g., Compl. ¶ 72 – Wells Fargo; ¶ 100 – Goldman Sachs; ¶ 116 – Morgan Stanley; ¶ 124 – RBC).  It was central to Nuveen's efforts to orchestrate a boycott of Preston Hollow to let UBDs and Deutsche Bank know that UBDs were being offered the same choice of either doing business with Nuveen or with Preston Hollow.  For instance, Davern told Morgan Stanley that Nuveen's actions were "uniform across the street" and that it was "building a book of dealers."  (Compl. ¶¶ 116–17). Hlavin likewise stated to Deutsche Bank that "we are going to every single bank and [UBD] today to examine what is the extent of their business [with Preston Hollow], and the policy going forward is that if you are doing – if you are actively doing business with [Preston Hollow],

---

[7] Deutsche Bank, who acted as a lender to Preston Hollow, and not as a UBD, is an exception.  (Compl. ¶ 40).  The Complaint does not plausibly allege that Deutsche Bank agreed to boycott Preston Hollow.  It asserts that Nuveen employees made a series of calls to Deutsche Bank to demand action against Preston Hollow but does not allege that Deutsche Bank stopped doing business with Preston Hollow.  On the contrary, the Complaint alleges that Nuveen reduced its financing arrangements with Deutsche Bank.  (Compl. ¶¶ 84–85).  It further asserts that Deutsche Bank employees told Miller that its legal and compliance groups expressed concerns regarding the legality of Nuveen's conduct.  (Compl. ¶ 94).  Accordingly, the Complaint does not plausibly allege facts that would permit a reasonable inference that Deutsche Bank entered into any type of agreement to boycott Preston Hollow.  But the Court considers the statements that Nuveen made to Deutsche Bank as part of Preston Hollow's showing of a broader pattern of conduct.

Nuveen will not be doing business with you."  (Compl. ¶ 78).  The Complaint further asserts that Nuveen employees discussed the status of UBDs who had already agreed to no longer underwrite offerings involving Preston Hollow.  This included Miller telling Deutsche Bank that he had "firm commitments" from four UBDs that "they'll never do business with Preston Hollow again."  (Compl. ¶ 82).  The Complaint also quotes Miller as stating to Deutsche Bank that "I've got 90% of the major top bracket muni [UBD] firms and banks to say absolutely never again, and I'm working on 100%.  I feel my chances are pretty good at getting there." (Compl. ¶ 89).  Similarly, Miller told Goldman Sachs that he had "five dealers so far . . . and I'm going to try and get more."  (Compl. ¶ 103 (alteration in original)).  Davern informed RBC that Nuveen "turned around several dealers," who would no longer underwrite 100% placements involving Preston Hollow.  (Compl. ¶ 124).  In addition, the Complaint alleges that "both Wells Fargo and Morgan Stanley specifically asked for and received assurances from Nuveen that all [UBDs] were complying" with the purported boycott.  (Compl. ¶ 165).

Preston Hollow does not allege any direct communications between UBDs regarding the purported boycott, (Oral Argument Tr. at 9), and the Complaint does not otherwise assert direct evidence of a horizontal agreement.  Nonetheless, the Court concludes that the Complaint supports a plausible inference of horizontal conspiracy between and among the UBDs.

The Complaint does not allege that Nuveen simply asked UBDs to agree to stop doing business with Preston Hollow.  Instead, the way Nuveen sought agreement supports the inference that it was offering UBDs the opportunity to join a horizontal agreement with competitors.  As described above, Nuveen's communications with a UBD did not pertain only to that UBD's business with Preston Hollow.  The Complaint alleges that Nuveen repeatedly told

UBDs that others were being offered the same choice between Nuveen and Preston Hollow and that a significant number of UBDs had in fact already agreed to stop doing business with Preston Hollow.  The Complaint supports the inference that Nuveen recognized it was necessary not only to have a large percentage of the leading UBDs agree to the boycott, but also for the UBDs to know that their competitors had agreed to it.

A fair inference is that both Nuveen and the UBDs knew it would have been foolish for a single UBD to agree to Nuveen's invitation to boycott Preston Hollow if that UBD were then to sit idly and watch a head-to-head competitor conduct a potentially lucrative transaction with Preston Hollow.  Likewise, a permissible inference is that Nuveen knew and understood that for the scheme to succeed, UBDs had to be assured that none of their competitors would escape inclusion in the boycott.  The allegations in the Complaint permit the reasonable inference that it would be more advantageous for an individual UBD to join the conspiracy only if other UBDs agreed to do so.  See Apple, 791 F.3d at 316 ("[A]s the district court concluded, Apple understood that its proposed Contracts were attractive to Publisher Defendants only if they collectively shifted their relationships with Amazon to an agency model.").

Nuveen urges that the allegations here are similar to the hub-and-spoke conspiracy that this Court considered in Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc., 516 F. Supp. 2d 270 (S.D.N.Y. 2007) (Castel, J.).  In Wellnx, the Court dismissed a per se claim in which plaintiff, a manufacturer of bodybuilding supplements, alleged that its competitor-defendant agreed with several publishers of bodybuilding magazines to boycott plaintiff's advertisements.  Id. at 291.  Although the Wellnx complaint asserted each publisher was aware that the defendant solicitated similar agreements from other publishers and was

offered a choice between conducting business with one of two competitors, in other important respects, the allegations in Wellnx were different from the ones in this case.  First, the Wellnx plaintiff only "speculate[d]" that the publishers who "formed vertical agreements with [defendant] . . . were likely made aware of the existence of the group boycott agreements with other [bodybuilding] publications and formed agreements with [defendant] believing their horizontal competitors would follow suit."  Id.  In Nuveen's case, the allegations, based partly on recorded phone calls, leave little room for speculation that UBDs were aware that Nuveen made the same offer to other UBDs.  Second, the allegations in Wellnx only asserted that each publisher had a substantial profit motive for refusing to deal with plaintiff.  As described above, the Complaint here supports the inference that, based on the alleged terms of Nuveen's offer, UBDs were agreeing to a boycott in which they did not bear the risk that their competitors could keep both Nuveen's and Preston Hollow's business.  The Complaint further alleges that certain UBDs asked for assurances that other UBDs were complying with the boycott and reported UBDs that were doing business with Preston Hollow.  (Compl. ¶¶ 165, 168).  Accordingly, unlike the allegations in Wellnx, the Court concludes that the allegations here are sufficient to support the inference that the UBD's parallel conduct "flowed from a preceding agreement rather than from their own business priorities."  Citigroup, 709 F.3d at 138.

Lastly, "it is an element of a per se case to describe the relevant market in which we may presume the anticompetitive effect would occur."  Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999); see also Downtown Music Publishing LLC v. Peloton Interactive, Inc., 436 F. Supp. 3d 754, 765 & n.5 (S.D.N.Y. 2020) (both per se and rule of reason claims require the plaintiff to "articulate a relevant market"); NYU Hosps. Ctr. v. League of Voluntary Hosps. & Homes of New York, 318 F. Supp. 3d 622, 634 (S.D.N.Y. 2018) (same).  Nuveen contends that

to state a per se violation a plaintiff must make some showing of a plausible relevant market. (Oral Argument Tr. at 32).

"The relevant market is broadly defined as 'the area of effective competition,' which is typically 'the arena within which significant substitution in consumption or production occurs.'" US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 55 (2d Cir. 2019) (quoting American Express, 138 S. Ct. at 2285); accord Concord Associates, L.P. v. Entertainment Properties Trust, 817 F.3d 46, 52 (2d Cir. 2016) ("A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." (internal quotation marks omitted)). Although there is "no absolute rule" against dismissal, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Todd v. Exxon Corp., 275 F.3d 191, 199–200 (2d Cir. 2001).

Preston Hollow alleges that the relevant market is the nationwide market "to provide financing to borrowers via high-yield municipal bond offerings." (Compl. ¶¶ 228–29). The parties agree that the relevant product market, and whether reasonable substitutes exist within that market, is determined from the perspective of the issuers. (Pl. Opp. at 31; Def. Reply at 15 n.23).

The Court concludes that Preston Hollow has alleged facts providing a plausible basis for its proposed relevant market. The Complaint defines the features of high-yield municipal bonds and distinguishes between high-yield and investment-grade municipal bonds, including the size of those markets and the issuance process. (Compl. ¶¶ 19–22, 26).

Investment-grade bonds have higher credit ratings and make up approximately 90% of the municipal bond market. (Compl. ¶ 20). Compared to a high-yield bond with a

similarly maturity, an investment-grade bond has a lower default risk, lower yield and is backed by the full faith and credit of the issuer.  (Compl. ¶¶ 20–21, 231–32).  In most cases, high-yield bonds are not suitable for retail investors.  (Compl. ¶ 231).  Issuers of high-yield bonds are also typically newer to the marketplace.  (Compl. ¶ 236).  As compared to the more standardized issuance process in the investment-grade market, issuance of high-yield municipal bonds typically involves extended negotiations between issuers, UBDs and investors, and can take longer to bring to market.  (Compl. ¶ 21).   In addition, the Complaint alleges that the industry recognizes high-yield municipal bonds as a distinct asset class.  (Compl. ¶¶ 51, 236); see Exxon Corp., 275 F.3d at 205 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).

Whether a municipal bond is classified as investment grade or high yield depends on the rating it receives from an agency such as Moody's or S&P.  (Compl. ¶ 20).  Notably, an issuer "cannot choose to participate in the investment grade municipal bond market unless they are capable of achieving a high rating from one or more of the nationally recognized statistical rating organizations."  (Compl. ¶ 236).  The Complaint alleges that other sources of financing are unavailable to issuers who receive a "high-yield" rating because investors are unwilling to provide financing to these issuers without the liquidity and tax-exempt yield characteristics of high-yield municipal bonds.  (Compl. ¶ 237).

Because the Complaint plausibly alleges vertical agreements between Nuveen and UBDs as well as a horizontal agreement between and among UBDs, and makes sufficient allegations concerning the relevant market, Preston Hollow has stated a claim for a per se violation of section 1.

D.  <u>Preston Hollow States a Claim Under the Rule of Reason.</u>

The Complaint also asserts that the agreements between Nuveen and UBDs to not engage in or originate 100% placements with Preston Hollow violated Section 1 of the Sherman Act under the rule of reason.  (Compl. ¶ 250–60).

"The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." <u>American Express</u>, 138 S. Ct. at 2284 (internal quotation marks and alterations omitted).  When the conduct challenged plausibly alleges a <u>per se</u> violation, "allegations pleading harm to competition are not required to withstand a motion to dismiss."  <u>Gelboim</u>, 823 F.3d at 775; <u>see</u> <u>PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy</u>, 19 cv 7577 (KMK), 2021 WL 1199363, at *27 (S.D.N.Y. Mar. 30, 2021) (declining to address rule of reason claim on motion to dismiss when plaintiff stated a <u>per se</u> violation).

Because the Court concludes that Preston Hollow has stated a <u>per se</u> violation, it is unnecessary for it to consider Nuveen's arguments that the Complaint fails to allege harm to competition at the motion to dismiss stage.  Accordingly, Nuveen's motion to dismiss Preston Hollow's rule of reason claim is denied without prejudice to renewal on summary judgment.

CONCLUSION

Nuveen LLC, Nuveen Investments, Inc. and Nuveen Securities LLC are dismissed without prejudice.  (Doc 41).  The motion of Nuveen Asset Management LLC to dismiss the Complaint is DENIED.  (Doc 31).  The Clerk is directed to terminate the motion. (Doc 31).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 10, 2021