UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
PRESTON HOLLOW CAPITAL LLC,            :

                                    :

                Plaintiff,      :         Index No.: 20-cv-5597-PKC-
                                    :         JLC
     -against-                 :         **SECOND**
                                    :         **AMENDED COMPLAINT**
NUVEEN ASSET MANAGEMENT LLC,       :
 and JOHN V. MILLER                :         **Demand for Jury Trial**
                                    :
                Defendants.      :
----------------------------------------------------------------------- x

        Plaintiff Preston Hollow Capital LLC ("Plaintiff" or "Preston Hollow") by its

attorneys, for its Second Amended Complaint against Defendants Nuveen Asset Management

LLC ("Nuveen") and John V. Miller (with Nuveen, "Defendants") alleges as follows:

## SUMMARY OF THE ACTION

        1.      This case arises from a series of threatening and anticompetitive

communications made about Preston Hollow by John V. Miller ("Miller"), Nuveen's head of

municipal finance, and subordinates at Nuveen acting at his direction, to the leading broker-

dealers in the municipal finance market, and to Preston Hollow's primary lender, intended to

organize a boycott of Preston Hollow by the broker-dealers and to cut off Preston Hollow's

financing.

        2.      Nuveen is a mutual fund company and one of the world's largest

institutional investors in municipal bonds, with municipal fixed income assets under

management of more than $150 billion.  Preston Hollow is an innovative municipal finance

company founded in 2014 whose principal business is to structure customized high-yield

municipal bond issuances in which it typically purchases 100% of the issued bonds.  Preston

Hollow's business model relies heavily on relationships with broker-dealers to identify

borrowers that may benefit from Preston Hollow's unique services, and upon liquidity to finance its bond purchases.  As a burgeoning contender in the high-yield municipal bond market, Preston Hollow poses a direct threat to Nuveen's ability to buy sufficient high-yield municipal bonds to satisfy market demand when there are cash inflows to its funds.

3.      In late 2019, Miller decided to eliminate the competitive threat posed by Preston Hollow by putting Preston Hollow out of business.  The unlawful communications by Miller and his subordinates were intended to impair Preston Hollow's ability to compete against Nuveen for investment opportunities in the high-yield municipal bond market and to deprive borrowers of the ability to freely choose to use Preston Hollow's unique services.

4.      Preston Hollow originally commenced an action in the Delaware Court of Chancery on February 28, 2019, asserting claims for tortious interference with contract, tortious interference with prospective business relations, and violations of New York's antitrust statute (called the Donnelly Act), seeking injunctive relief as a result of Nuveen's tortious and unlawful conduct.  After ordering expedited treatment and severing the defamation claim and transferring it to Delaware Superior Court, the Court of Chancery held a trial on Preston Hollow's remaining claims on July 29 and 30, 2019.

5.      On April 9, 2020, Vice Chancellor Sam Glasscock of the Delaware Court of Chancery issued a Memorandum Opinion concluding that Nuveen committed tortious interference with Preston Hollow's business relations.[1]  Among other things, the Court of Chancery specifically found that (i) "Nuveen used threats and lies in a successful attempt to damage the Plaintiff in its business relationships"; (ii) Nuveen's conduct constituted tortious interference with Preston Hollow's business relations with six different broker-dealers (Goldman

---

[1] See *Preston Hollow Capital LLC v. Nuveen LLC, Nuveen Investments, Inc., Nuveen Securities LLC, & Nuveen Asset Management LLC*, 2020 WL 1814756 (Del. Ch. Apr. 9, 2020).

Sachs ("Goldman"), JPMorgan, KeyBanc, Mesirow, Stifel, and Wells Fargo) and caused actual economic harm with respect to Preston Hollow's relationship with each of those broker-dealers; (iii) recordings of calls between Miller and his associates and Goldman demonstrated that Nuveen either intentionally or recklessly lied to Goldman about Preston Hollow's business practices, including misrepresentations "that Preston Hollow lied to issuers, and [Nuveen] promised it had evidence to support this allegation when it had only rumors from the trading desk" and "that Preston Hollow's 'unethical practices' had caught the attention of the states' attorney generals who sent 'nastygrams'"; and (iv) with respect to Nuveen's communications with other broker-dealers that were not recorded, "the evidence leads [the Court] to believe they were part of the same pattern of conduct intended to end these broker-dealers' relationships with Preston Hollow."

6.      The Court of Chancery declined to rule on Preston Hollow's claim under New York's Donnelly Act pursuant to Delaware's "policy against innovating in sister-states' laws" based on its determination that whether the Donnelly Act authorized injunctive relief for a private plaintiff was unresolved.  However, the Court of Chancery found as a matter of fact that Nuveen used its market power to organize an industry-wide boycott to eliminate Preston Hollow as a competitor – a prima facie violation of the Donnelly Act as well as the federal antitrust laws:

> The facts revealed in litigation . . . show that as Preston Hollow was becoming a contender in the high-yield municipal bond market, Nuveen, the self-styled "largest high-yield [municipal] fund in the world," sought an industry-wide agreement not to conduct business with Preston Hollow.  Although part of Nuveen's motive was its interest in "seeing all the deals," its behavior shows that its object was also an attack directed at Preston Hollow's ability to operate.  The evidence demonstrated an aggressive and widely dispersed campaign to use almost any pressure necessary to cut off a competitor from its chief source of business as well as its financing.  I find that Nuveen was not simply attempting to achieve a competitive edge; it meant to use the leverage resulting from its size in the market to destroy Preston Hollow.

7.      In this action, Preston Hollow asserts claims against Nuveen for violations of the federal Clayton and Sherman Acts, as well as the Donnelly Act, and a claim against Miller for tortious interference with Preston Hollow's prospective business relations.

8.      Defendants' misconduct has caused damages to Preston Hollow in an amount to be proven at trial, but not less than $100 million in damages before trebling.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the Clayton and Sherman Act claims asserted in this matter pursuant to 28 U.S.C. § 1331.

10.      This Court has subject matter jurisdiction over the other claims asserted in this matter pursuant to 28 U.S.C. § 1367.

11.      Venue in the Southern District of New York of the United States District Court is appropriate pursuant to 28 U.S.C. § 1391.

12.      This Court has personal jurisdiction over Nuveen and Miller because a substantial number of the broker-dealers are located in New York; communications between Miller, his subordinates acting at his direction, and the broker-dealers were purposefully directed at or took place in New York; Miller personally traveled to New York to meet with representatives of broker-dealers in furtherance of his tortious conduct; and Nuveen's misconduct has significant impact on competition in New York.

## THE PARTIES

13.      Plaintiff Preston Hollow Capital LLC is a limited liability company organized and existing under the laws of the State of Delaware.

14.      Defendant Nuveen Asset Management LLC is a limited liability company organized and existing under the laws of the State of Delaware.

4

15.     Defendant John V. Miller is an individual and resident of the State of Illinois.  He is the Head of Municipals at Nuveen and is a member of its Global Investment Committee.

## FACTUAL BACKGROUND

### I.     The Municipal Bond Market

16.     Municipal bonds are debt securities issued by cities, counties, states, and other governmental or non-profit entities to fund day-to-day obligations and to finance specific projects such as schools, hospitals, higher education facilities, and other public works that benefit local communities.  The municipal bond market is comprised of over one million distinct municipal securities, issued by more than 50,000 different issuers, with approximately $3.8 trillion in outstanding securities.  Issuers work with independent financial advisors to evaluate the benefits and costs of issuing municipal bonds.  The bonds generally pay interest that is exempt from federal, and sometimes state, income taxes.

17.     Approximately 90% of municipal bonds are "investment grade," which generally means they are rated BBB-/Baa3 or better by Moody's and S&P.  The remaining 10% are rated lower than BBB-/Baa3 or are unrated, and are referred to as "high-yield" bonds. Investment grade municipal bonds are primarily high-quality bonds with comparatively low default risk and yields.  These bonds typically go through a standardized origination process and are typically made available to investors through a public offering.

18.     The high-yield municipal market consists of municipal bonds with higher default risks, lower credit quality, and higher yields than investment grade municipal bonds. High-yield municipal bonds are usually subject to extended negotiations between the various parties involved and can take longer to bring to the market than investment grade bond transactions.

19.     As in other securities markets, new municipal bonds are issued on the "primary" market and then traded on the "secondary" market.

20.     Primary municipal bond issuances typically involve at least three parties: the issuer, the broker-dealer, and the investor.  The issuers are municipalities or other government or non-profit entities that seek to raise capital to finance public works.  The investors provide capital to finance these public works projects by purchasing the bonds.  Finally, broker-dealers act as intermediaries and assist in facilitating the issuance of the bonds by providing services like marketing, pricing, underwriting, and closing.

21.     For public offerings, a broker-dealer is required to act as an underwriter to ensure that the necessary due diligence has been performed.  For any type of offering, having a top-tier underwriter's name affiliated with a municipal bond acts as a seal of approval for the transaction and enhances the value of the bonds in the secondary market.

22.     To finance investments in municipal bonds, investors like Preston Hollow and Nuveen often have financing arrangements with banks and broker-dealers.  These arrangements allow investors to effectively finance the purchase of bonds at tax-exempt rates. They also create attractive revenue opportunities for banks and broker-dealers.  A common financing mechanism, employed by Preston Hollow and Nuveen, is called tender option bond (or "TOB") financing.

23.     Municipal bonds are issued through both public and private offerings. Limited public offerings are a type of public offering where an issuer negotiates exclusively with one or more investors to buy all or a significant portion of the bonds offered.  In limited public offerings, an order is opened publicly, an investor's order for most or all of the bond issue is placed, and the order is closed.  Limited public offerings are commonplace in public finance and

endorsed by the various parties involved in municipal bond deals, as they provide the certainty of a private offering, but are subject to the same level of due diligence and underwriting as public offerings.  However, limited public offerings generally come with more risk than conventional public offerings, and traditionally offer higher yields due to the due diligence and underwriting required.

24.     From 2014 through early 2020, the demand for high-yield municipal bonds generally exceeded the supply of high-yield bonds available for investment.  This means that there were more investors with cash available to invest than there were municipal bonds being issued.  As a result, investors competed to invest their assets in a limited number of municipal bonds

25.     Broker-dealers in the municipal bond market have sales desks that buy and sell bonds in both the primary and secondary markets.  Many broker-dealers also have separate investment banking departments that provide advisory and structuring services to their clients. Because the investment bankers may have access to material, non-public information, they are "walled off" from the "public facing" trading desks.

26.     One tool municipal bond traders use to leverage desired actions is to express displeasure by putting another party or entity "in the box."  Being "in the box" has no official repercussions and so can be used somewhat casually.  However, being "in the box" can lead to more serious consequences, such as a temporary cessation of business between parties. As detailed below, Nuveen put counterparties that did business with Preston Hollow "in the box" (cutting off all or part of the business relationship), or threatened to do so, to leverage its market power to harm Preston Hollow.

II.     **Preston Hollow's Role in the Municipal Bond Market**

27.     Preston Hollow was formed in 2014 as a finance company dedicated to

making investments in municipal finance.  It currently has approximately $2 billion in assets and $1.5 billion in equity capital from a diverse investor base comprised of founding management, institutional investors, and family wealth organizations.

28.     Preston Hollow's primary business is the origination and structuring of municipal finance transactions in which Preston Hollow purchases 100% of the securities through negotiated agreements with the issuers, borrowers, underwriters, and (where applicable) financial advisors ("100% placements").  These transactions provide issuers with the benefit of Preston Hollow's sector expertise, including flexible and customized solutions that meet an issuer's specific needs.  Nuveen also has engaged in 100% placements from time to time.

29.     Preston Hollow is a permanent capital vehicle with a stable, secure funding source.  This insulates its investing activities from market forces including downturns in the municipal bond market.  Mutual funds like Nuveen, by contrast, are subject to daily withdrawals of capital which can impact a fund's ability to purchase or hold bonds.

30.     Before Nuveen's defamatory attacks, most of the transactions that Preston Hollow invests in were brought to Preston Hollow by broker-dealers.  Although Preston Hollow sometimes can bring a potential transaction to a broker-dealer, before Nuveen's attacks the vast majority of Preston Hollow's business opportunities came from broker-dealers notifying Preston Hollow of potential transactions.

31.     Preston Hollow's investments through limited public offerings are bespoke, highly negotiated transactions, frequently formulated through a detailed credit analysis over many months, in which the issuer is typically represented by independent registered financial advisors and bond counsel.  The issuers also engage an underwriter for the transaction, which is separately represented by underwriter's counsel.  Rates, term, and structure are often

agreed to months before the bonds are issued.

32.     To provide these specialized services, Preston Hollow staffs a deep bench of former municipal finance investment bankers, bond lawyers, credit analysts, and financial engineers to review and analyze potential municipal transactions.  This enables Preston Hollow to tailor investments to the specific needs of particular issuers while meeting Preston Hollow's credit underwriting specifications and return criteria.

33.     Purchasing through 100% placements allows Preston Hollow to benefit from the time, expertise, financial commitments, and resources it has dedicated to structuring and consummating the transaction.

34.     Preston Hollow seeks investments that promote a positive social impact, financing essential projects and services that benefit local communities, particularly those in economically disadvantaged areas.

35.     Preston Hollow's ability to invest in municipal bonds is highly dependent upon its relationship with broker-dealers, since the investment bankers are able to identify which of their issuer clients and transactions will benefit from Preston Hollow's unique positioning and sector expertise.

36.     Additionally, since Preston Hollow is not a broker-dealer, it will sometimes arrange for a broker-dealer to be engaged to serve as underwriter for transactions that Preston Hollow directly sources.

37.     Preston Hollow frequently utilizes the financing arrangements described in paragraph 25 above to fund its municipal bond investments.  Its primary counterparty for TOB financing is Deutsche Bank.

38.     When, as a result of Nuveen's improper conduct, broker-dealers ceased

making Preston Hollow aware of investment opportunities, and when they refused to serve as underwriter for transactions that Preston Hollow directly originated, Preston Hollow's business of investing in municipal bonds that are the product of its custom-structured solutions was significantly impaired.

39.     When broker-dealers do not make Preston Hollow aware of investment opportunities, or when they refuse to serve as underwriter for transactions that Preston Hollow directly originates, Preston Hollow's business of investing in municipal bonds that are the product of its custom-structured solutions are significantly impaired.

40.     Likewise, Preston Hollow's business will be significantly impaired if lenders and broker-dealers refuse to provide financing for Preston Hollow's investments.

41.     If Preston Hollow is unable to engage in 100% placements, municipal issuers of high-yield bonds (*i.e.*, potential "consumers" of Preston Hollow's services) will be denied the opportunity to benefit from Preston Hollow's unique ability to provide bespoke solutions to the issuers' specific needs and certainty of execution, reducing the choices available to municipal issuers of high-yield bonds and leaving issuers worse off.

### III.    Preston Hollow Provides Unique Value to Borrowers

42.     As the Delaware Court of Chancery found, Preston Hollow's business and finance model are unique and new in the municipal bond market.

43.     Preston Hollow is a bespoke solution provider that custom designs its deal structures to lend flexibility and security to issuers through 100% placements, providing unique value to borrowers.

44.     Preston Hollow's unique business model and value to borrowers is recognized by borrowers, including both Howard University and Roosevelt University (both of

whom are "repeat customers" of Preston Hollow). The trial testimony of Andrew Harris, Chief

Financial Officer of Roosevelt University, illustrates well Preston Hollow's unique value to

borrowers:

> I think it's important for the Court to hear that there's a very satisfied customer in
> Roosevelt University. This was a problem we were trying to solve that needed
> speed, flexibility, nimbleness, customization, and a willingness to get to know the
> peculiarities and specifics of our situation at Roosevelt. And Preston Hollow in
> every way was true to form, performed as advertised, did what they said they
> would do when they said they would do it. And we got what we wanted and
> needed out of this deal. So I think that's worth talking about openly and we're
> proud of it.

45.     Preston Hollow grew rapidly from its founding in 2014 to approximately

$2.1 billion in assets and $1.3 billion in equity capital as of July 2019 despite the municipal bond

supply shortages referenced above. The market for high-yield municipal bonds was down by

approximately 25% from 2017 through 2018, but Preston Hollow's origination volume increased

by 35% during that time. Despite a seller's market since 2014, Preston Hollow has been able to

use its unique solution to achieve year-over-year growth. Preston Hollow's market performance

provides economic evidence of the unique value it offers to borrowers.

46.     Broker-dealers also have come to recognize the benefits that Preston

Hollow offers borrowers. For example, according to Morgan Stanley, Preston Hollow is "an

innovative municipal finance investment company" "[w]ith a focus on bespoke opportunities"

and "has been able to provide capital to support municipal and 501c3 borrowers in ways that

traditional municipal investment firms do not." The head of municipal securities at Morgan

Stanley testified that "[t]here is [sic] not a lot of people that have Preston Hollow's business

model. It is somewhat new to the municipal marketplace . . . it's new and it's something that the

market is digesting."

47.     Goldman also recognized the service Preston Hollow provides. Prior to

Nuveen's attack on Preston Hollow, Goldman was discussing approximately twelve projects with Preston Hollow.  In internal comments in response to Nuveen's threats, the Goldman co-head of municipal finance stated, "I am not sure Miller understands how these deals are coming about - they are not capable of replicating what PH is doing."

IV.   **Nuveen's Role in the Municipal Finance Market**

48.    Nuveen is an asset management firm that invests on behalf of retail and institutional investors, with approximately $160 billion in municipal assets and $27 billion in high-yield municipal bond funds as of 2019.  Nuveen is 80-times larger than Preston Hollow in terms of total municipal bonds, and 13.5 times larger in just the high-yield market.

49.    Nuveen is the nation's largest manager of high-yield municipal bond mutual funds.  It is, in its own words, "the largest high-yield muni shop in the world."  This gives Nuveen broad market power and influence with municipal broker-dealers and lenders, who derive significant annual revenue from transactions with Nuveen-managed funds.

50.    Nuveen's municipal bond department is run by John Miller.   Miller manages a team of employees, including Karen Davern ("Davern") and Steve Hlavin ("Hlavin").  Davern is Nuveen's head municipal trader, and Hlavin is a portfolio manager.

51.    Nuveen's model, in contrast with Preston Hollow's permanent capital financing, is the mutual fund model, which requires liquidity when there are "outflows" of cash as investors withdraw from a fund.  When Nuveen has net "inflows" of cash – that is, when investors buy into Nuveen funds – Nuveen requires access to bonds so that the cash is fully invested.  Therefore, the opportunity to purchase new issuances in the primary market allows Nuveen to meet market demand.

52.    When Preston Hollow conducts 100% placements, it funds the entire

issuance and, consequently, Nuveen cannot purchase any of the bonds.  This lessens Nuveen's ability to meet market demand because it diminishes the array of purchase options available to it.

53.     Nuveen is one of the largest trading partners for all the top-tier broker-dealers, doing more than $13 billion in business with nine major broker-dealers, and therefore may be the most important customer for the broker-dealers' sales desks.

54.     Nuveen is also one of the largest users of TOB financing.  At December 2018, Nuveen had $1.9 billion in TOB financing outstanding with Deutsche Bank.

55.     In short, Nuveen has extensive influence and market power.

## V.    Nuveen's Inability to Participate in Preston Hollow Investments

56.     Beginning in approximately early 2017, Preston Hollow began to hear through various municipal finance market participants that Miller and Nuveen were taking an aggressive posture toward institutions who were conducting business with Preston Hollow. Though troubling, Preston Hollow initially considered these incidents to be isolated. Reports of these incidents increased in frequency throughout 2018, however, reaching a crescendo in December 2018.

57.     In late 2018, Preston Hollow closed two municipal bond investments through limited public offerings to finance improvements and refinance previous debt at universities, referred to herein as Howard University and Roosevelt University.  Because these investments were made available by broker-dealers through limited public offerings that were negotiated and structured by Preston Hollow as 100% placements, Nuveen was unable to participate in the purchase of the municipal bonds.  Long before the bonds were issued, each borrower entered into a term sheet with Preston Hollow after receiving approval from its board, outlining the material terms of the transaction including security and rates.  Each borrower was

represented by counsel and a financial advisor in its respective transaction.

58.     In or around November 2018, Preston Hollow closed an approximately $32 million bond with Howard University to help finance the construction of a student housing facility (the "Howard Center Bonds").  The Howard Center Bonds are not backed by the full faith and credit of Howard University, and do not enjoy a first lien mortgage or a revenue pledge as collateral other than revenues generated by the asset itself.  Preston Hollow is responsible for any excess costs and fees associated with constructing the facility.  Bank of America served as the broker-dealer and underwriter for the Howard Center Bonds.  In 2020, Preston Hollow engaged in another 100% transaction with Howard University (the "Howard Quad Transaction").

59.     Nuveen had previously purchased bonds issued by Howard University, but those bonds were general obligation bonds backed by the full faith and credit of Howard University, and thus had a lower yield than Preston Hollow's Howard Center Bonds.

60.     Preston Hollow also invested approximately $200 million in municipal bonds issued by Roosevelt University to restructure debt in an effort to provide relief from prior debt service obligations (the "Roosevelt University Bonds," and together with the Howard Center Bonds, the "University Bonds").  Wells Fargo served as the broker-dealer and underwriter for the Roosevelt University Bonds.

61.     As the investor in the University Bonds, Preston Hollow performed many months of due diligence and structuring efforts and incurred significant out-of-pocket legal and consulting expenses on each of the deals.

62.     Given the time and effort exerted by Preston Hollow to negotiate, structure, and close the University Bonds, and Preston Hollow's commitment of capital several months in advance at previously agreed-upon interest rates, the University Bonds were made

available to Preston Hollow through limited public offerings in which Preston Hollow was offered 100% of the bonds issued.

63.     Because the University Bonds were issued via 100% placements, Nuveen was not able to purchase any of the Bonds.

## VI.     Miller Organizes an Unlawful Boycott of Preston Hollow

64.     As early as 2017, Nuveen had focused on Preston Hollow as a competitor and contacted broker-dealers with a message: choose between doing business with Nuveen and doing business with Preston Hollow.

65.     Prior to December 2018, Nuveen had addressed its concern about Preston Hollow as a threat to its business with specific broker-dealers as it learned of transactions in which those broker-dealers had worked with Preston Hollow.  It did so by punishing broker-dealers for underwriting bonds sold to Preston Hollow by putting them "in the box."

66.     For example, after the Roosevelt University Bonds transaction was announced in October 2018, Nuveen refused to trade high-yield bonds with Wells Fargo because it had worked with Preston Hollow on the transaction.

67.     At a lunch meeting between Nuveen and Wells employees on November 19, 2018, Wells Fargo agreed to no longer do 100% placements like the Roosevelt transaction with Preston Hollow and that "Nuveen would see every deal."

68.     Following that agreement, Nuveen resumed trading high-yield bonds with Wells Fargo.  Miller characterized the commitment by Wells Fargo as an agreement to put new deals through "a more rigorous approval and due diligence process," and told his team that the people they dealt with on the Wells trading desk "had no involvement with the Roosevelt []/Preston Hallow [sic] situation."

69.     Nuveen assured Wells Fargo that other broker-dealers would be punished for working with Preston Hollow.

70.     On December 20, 2018, Miller learned that Bank of America had closed the Howard Center Bonds transaction, selling 100% of the bonds to Preston Hollow.

71.     Beginning that day and continuing over the following days and months, Miller and his staff at Nuveen initiated a series of phone calls and meetings with Deutsche Bank (Preston Hollow's primary lender) and representatives of substantially all of the leading broker-dealers covering the municipal bond market as part of a campaign of slander and intimidation to coerce and prevent them from doing business with Preston Hollow.

A.    Nuveen Threatens Deutsche Bank and Describes the Boycott

72.     On the morning of December 20, 2018, Miller instructed his subordinates that, if Deutsche Bank provided TOB financing to Preston Hollow for the Howard Center Bonds, "we will be taking our business to zero with them as soon as practicable."

73.     On December 20, 2018, Hlavin of Nuveen spoke with Deutsche Bank on the telephone.

74.     Hlavin demanded Deutsche Bank cease financing Preston Hollow transactions or Nuveen would retaliate by removing business from Deutsche Bank.  Hlavin informed Deutsche Bank that Miller viewed Deutsche Bank as Preston Hollow's financing and source of liquidity, and had directed that Nuveen's TOB business with Deutsche Bank be reduced "to zero," "because we need to make a very clear and consistent stance that we are not going to be doing business with anyone who chooses to support this kind of activity [business with Preston Hollow] in the market."  Hlavin asked Deutsche Bank what needed to happen to unwind existing relationships with Preston Hollow so he could "set the proper expectations"

16

internally at Nuveen.

75.     Hlavin informed Deutsche Bank, "we are going to every single bank and broker-dealer today to examine what is the extent of their business [with Preston Hollow], and the policy going forward is that if you are doing – if you are actively doing business with [Preston Hollow], Nuveen will not be doing business with you."

76.     Hlavin made clear his call to Deutsche Bank was part of a systematic effort to organize the entire industry against Preston Hollow by telling Deutsche Bank that "[e]verything is going to get back to us, especially now, especially now that we are making these phone calls and we are making it perfectly transparent about our intention to - to not support anyone who supports [Preston Hollow's] private market activity."

77.     Hlavin told Deutsche Bank that "Karen [Davern] and [Miller] are going to our top 20 dealers right now and having this -- having the same conversation."

78.     Hlavin said "Preston Hollow's lending practices have to stop," that Nuveen will have a "consistent stance" across all dealers, and "we are not going to participate or do business with anyone who supports them."

79.     The following day, Miller called Deutsche Bank to reiterate the message delivered by Hlavin.  After telling Deutsche Bank, untruthfully, that he had evidence of wrongdoing by Preston Hollow, Miller informed Deutsche Bank that he had "firm commitments" from Wells Fargo, Bank of America, Goldman, and JPMorgan that "they'll never do business with Preston Hollow again."

80.     Miller informed Deutsche Bank that Preston Hollow did business in an unethical way, that its deals were "dirty," and that "my goal" was to make Preston Hollow's deals less financeable.

81.     Miller informed Deutsche Bank that Nuveen was removing $300 million of TOB business from Deutsche Bank immediately because of Deutsche Bank's relationship with Preston Hollow.  He told them that this was the "first round" and implied that further reductions in business could be averted if Deutsche Bank stopped doing business with Preston Hollow.  Ron Van Den Handel, one of the Deutsche Bank representatives on the call with Miller, testified at trial that he understood that Deutsche Bank could avoid further reductions in business with Nuveen by ceasing business with Preston Hollow.

82.     Following Nuveen's calls to Deutsche Bank, Nuveen punished Deutsche Bank by reducing the amount of Nuveen's TOB financing with Deutsche Bank by approximately $1 billion, from $1.9 billion to $900 million as of the time of trial.

83.     On the December 21 call with Deutsche Bank, Miller confirmed he was looking to cut off Preston Hollow's financing from all sources, not just Deutsche Bank, to prevent Preston Hollow from doing business.

84.     Miller said to Deutsche Bank: "Who else are they going to get financing from when Wells Fargo, Goldman, JPMorgan, Bank of America and Citi have agreed to not do this business anymore? I don't know where they're going to get the financing from."

85.     Miller described a systematic effort to organize the leading broker-dealers in a boycott against Preston Hollow by saying he already had "firm commitments" from Wells, JPMorgan, Goldman, and Citigroup not to do business with Preston Hollow.

86.     Miller also stated "I've got 90% of the major top bracket muni broker-dealer firms and banks to say absolutely never again, and I'm working on 100%. I feel my chances are pretty good at getting there."

87.     Miller said he was no longer content to punish broker-dealers after the fact

18

for "infractions" but was "turning . . . the system in a different direction" by organizing a group of "partners who have promised me they will show me everything" and who are "all on board with our procedures on a going forward basis."

88.     Deutsche Bank understood Miller to be asking them to join a group with Bank of America, JPMorgan, Wells, Goldman, and Citibank that was agreeing not to do business with Preston Hollow.

89.     Deutsche Bank elevated Nuveen's "unprecedented" threats to its Legal and Compliance departments.

90.     The December 20 and December 21 phone calls by Hlavin and Miller, respectively, to Deutsche Bank were recorded by Deutsche Bank in the ordinary course of business.

91.     In January 2019, a few weeks after receiving Nuveen's threats, Deutsche Bank personnel met with Miller.  In that meeting, Deutsche Bank informed Miller that it would not accede to Nuveen's demands because Deutsche Bank's Legal and Compliance groups had instructed them that Nuveen's request to boycott Preston Hollow was illegal.  Miller responded: "So you're letting your Legal and Compliance tell you how to run your business?" as if he was incredulous that anyone would allow compliance with the law to get in the way of doing business.

92.     Beginning the same day – December 20, 2018 – Miller and Davern placed calls to ten broker-dealers about Preston Hollow, and continued to communicate with broker-dealers about Preston Hollow through February 2019.

93.     Some of these calls were made on recorded lines.  Preston Hollow was able to obtain several telephone recordings during the action in the Delaware Court of Chancery.

94.     Nuveen admits that, as a result of these calls, it obtained agreements from at least five broker-dealers to show every deal to Nuveen, and therefore not to do 100% placements with Preston Hollow.  Davern testified at trial that this was the case, and that she was unaware of any breach of the agreements by any of the broker-dealers as of the date of trial.

B.   Goldman Agrees to the Boycott

95.     On December 21, 2018, Miller had a telephone call with the head of municipal bond sales at Goldman (Goldman's "public facing" sales desk).  The call was recorded by Goldman in the ordinary course of business.

96.     On that call, Miller explained that the growth of Preston Hollow's business was a strategic concern to Nuveen:  "It's the growth and the infringement – it's the growth and the infringement on issuers that you and I would be trading right now if those issuers weren't falling for these predatory practices."  Miller said he was "trying to be forward looking" and although "performance in our asset class has not been driven by this array of deals [*i.e.*, the Preston Hollow deals] . . . I might have to acknowledge a different statement . . . in a year or two."

97.     Miller described his efforts to organize the boycott of 100% placements with Preston Hollow and recruited Goldman to join: "[R]ather than our -- our normal process of we do business with everybody unless there's some kind of egregious infraction and then we put them in the box, really doing gating – I'm doing a gating item for my counterparties . . . . And that is to be a partner with Nuveen, and I need you on my team, you can't do any of this private bullshit business with Preston Hollow."

98.     Miller continued:  "I just am looking at a -- a new way of – of picking counterparties for next year and just saying, you know, you -- you have to choose. You have to

choose who you want to do business with.  Because I don't want to do business with those firms that do business with Preston Hollow."

99.     Miller further elaborated that "the street just has to choose . . . They have to choose who and what type of business they're going to do because they're not going to do both.  At least not with Nuveen they're not going to do both."

100.     Miller informed Goldman he had "like five dealers so far . . . And I'm going to try and get more."

101.     Goldman understood that Miller was "going to all the major dealers who deal with Nuveen and telling them that if they do business with Preston Hollow then Nuveen will not do business with them."

102.     As of late 2018, Goldman's private municipal banking group was in discussions with Preston Hollow regarding twelve potential transactions.  Goldman also had expressed an interest in serving as underwriter for the Howard Center Bonds transaction, which was ultimately awarded to Bank of America.

103.     A number of representatives from Goldman met with Miller on January 22, 2019.[2]

104.     At the January 22 meeting, Miller reiterated his threat to cut off business with Goldman if it continued doing business with Preston Hollow.

105.     Goldman subsequently informed Preston Hollow that Goldman was working on a "matrix" regarding what transactions it could pursue with Preston Hollow. Goldman never completed its so-called "matrix" and it remains under review.  Goldman also informed Preston Hollow that Goldman would not participate in any transaction that would

---

[2] This was *after* Nuveen received a cease and desist letter from Preston Hollow.  *Infra*, ¶¶ 200-203.

affect a public bondholder like Nuveen.

106.    Despite previously being interested, Goldman declined to participate in the Howard Quad Transaction following Nuveen's threats.

107.    Of the twelve deals that were under discussion with Preston Hollow at the time of Miller's threats, Goldman has not moved forward on a single one.

108.    Preston Hollow has received no meaningful inquiries from Goldman about potential transactions since Miller's threats.

C.    Morgan Stanley Agrees to the Boycott

109.    Preston Hollow and Morgan Stanley had worked together on 100% placements in 2017 and 2018 and, as of December 2018, they were in the process of negotiating a 100% placement.

110.    On December 20, 2018, Davern had two calls with the head of municipal securities trading at Morgan Stanley, both which were recorded.  Davern made the calls at Miller's direction.

111.    During these calls, Davern said Nuveen had heard from Bank of America that Morgan Stanley was working on a large deal with Preston Hollow, and therefore Nuveen was putting Morgan Stanley "in the box."

112.    Davern complained that Preston Hollow was "going and sourcing muni debt that is being removed from our ability to buy it" and that Nuveen was "taking a stand against it . . . because it's taking paper away from us."

113.    Davern also informed Morgan Stanley that Miller was "building a book of dealers that are not going to do this type of business," referring to 100% placements with Preston Hollow.

22

114.    Davern confirmed to Morgan Stanley that Nuveen's requirement to boycott Preston Hollow was going to be "uniform across the street."

115.    Davern said Nuveen had put Bank of America "in the box" for doing a 100% placement transaction with Preston Hollow and that Nuveen already "straightened out" Wells Fargo and Citibank.

116.    When the Morgan Stanley representative pointed out that entities other than Preston Hollow also engaged in 100% transactions, Davern exclaimed, "it's Preston Hollow that is mostly doing this" and "I don't want to change the subject," making clear that the "subject" was Preston Hollow and not 100% placements in general.

117.    The Morgan Stanley representative understood from his calls from Davern on December 20, 2018 that Morgan Stanley was "in the box" with respect to trading high-yield and taxable bonds with Nuveen and would remain so if it continued to do 100% placements with Preston Hollow.  However, he further understood that Miller was going to speak with Morgan Stanley's head of municipal securities, who has responsibility for both the public trading desk and the private banking group about a "path forward."  That conversation occurred over the holiday period and, to Preston Hollow's knowledge, was not recorded.

118.    Morgan Stanley then began the new year in 2019 out of the "box" despite Nuveen's December 20 ultimatum, meaning that Morgan Stanley agreed over the holidays it would not engage in 100% placement transactions with Preston Hollow.

119.    Morgan Stanley has not engaged in any 100% placement transactions with Preston Hollow since Nuveen's December 20, 2018 threats.

D.  RBC Agrees to the Boycott

120.    On January 9 and 11, 2019, Davern and Miller had two calls with the

Managing Director and Sales Manager for Municipal Sales at RBC.

121.    Davern informed RBC that Miller "has been going around the streets since before Christmas talking to all of the majors about how they have to stop doing this business and how bad it is for . . . our business going forward."   She said that that Nuveen "turned around several dealers" who agreed to stop doing business with Preston Hollow.

122.    Davern offered the RBC representative a chance to partner with Miller to fight Preston Hollow, and he accepted.  Thereafter, RBC has not engaged in 100% placements with Preston Hollow.

123.    RBC also has policed the behavior of other broker-dealers by reporting to Nuveen instances where broker-dealers engaged in 100% placements with Preston Hollow.

E.   Bank of America Agrees to the Boycott

124.    Bank of America was the underwriter for the Howard Center Bonds transaction, which closed on November 28, 2018.

125.    On December 20, 2018, Davern called Bank of America and informed it that it was "in the box" as a result of its role as underwriter for the Howard Center Bonds.

126.    That day, Miller had a conversation with the head of institutional municipal bond sales at Bank of America.  In an email, Miller said he "dumped two years of research" about Preston Hollow on the Bank of America head of municipal bond sales, and asked for an agreement not to do 100% placements with Preston Hollow.

127.    The following day, December 21, 2018, Bank of America communicated to Miller its agreement not to underwrite 100% placements with Preston Hollow.  Later that day, Miller stated to Deutsche Bank that he had a "firm commitment" from Bank of America not to do 100% placements with Preston Hollow.

128.     The head of municipal bond sales at Bank of America informed two Preston Hollow representatives that Bank of America's decision not to do 100% placements was due to pressure from Nuveen and the fact that Nuveen provides tens of millions of dollars of revenue a year to Bank of America while Preston Hollow provides only a few hundred thousand.

F.   JPMorgan Agrees to the Boycott

129.     JPMorgan received a call from Miller just before Christmas because Miller was unhappy about the Roosevelt University Bonds transaction.  During the call, Miller questioned JPMorgan about its internal procedures for approving deals.

130.     Also during that call, JPMorgan agreed not to underwrite 100% placements with Preston Hollow.

131.     Following that call, Miller was happy with JPMorgan and there was no disruption in business between JPMorgan and Nuveen.

132.     On December 21, 2018, Miller represented to Deutsche Bank that he had a "firm commitment" from JPMorgan not to do 100% placements with Preston Hollow.

133.     Prior to Miller's December 20 call, JPMorgan was seeking to expand its business relationship with Preston Hollow.

134.     JPMorgan also had contacted Preston Hollow on November 20 about underwriting the Howard Quad Transaction.  The Howard Quad Transaction was a good fit for JPMorgan because it was one of Howard University's preferred bankers.

135.     Preston Hollow contacted JPMorgan in early 2019 about participating in the Howard Quad Transaction.  After putting Preston Hollow off for several weeks, JPMorgan informed Preston Hollow that it was not interested in serving as the underwriter because it said it did not have adequate time to secure the approvals necessary to do the deal.  When Preston

25

Hollow assured JPMorgan that Preston Hollow would wait as long as necessary for JPMorgan to secure the required approvals, JPMorgan informed Preston Hollow that it was not interested in serving as the underwriter for the transaction.

G. Mesirow Agrees to the Boycott

136. Miller represented to Deutsche Bank on December 21, 2018 that Mesirow (among others) was "onboard with our procedures on a going forward basis."

137. Preston Hollow was working on six transactions with Mesirow in late December 2018 but, after contact with Miller, Mesirow pulled out, refused to engage with Preston Hollow, and has not brought any potential opportunities to Preston Hollow since.

138. Hlavin bragged to Deutsche Bank that Nuveen was responsible for Mesirow's about-face.

139. Although Nuveen denied contacting Mesirow, the Delaware Court of Chancery did not credit Nuveen's denial and found it "more likely" that Nuveen blocked or attempted to block the Mesirow transactions with Preston Hollow.

H. Stifel Agrees to the Boycott

140. Miller represented to Deutsche Bank on December 21, 2018 that Stifel was "onboard with our procedures on a going forward basis."

141. Prior to December 2018, Stifel had completed several 100% placement deals with Preston Hollow, including deals that Stifel originated.

142. In October 2018, Davern met with Stifel representatives and indicated that Nuveen would consider curtailing business if Stifel failed to show it every transaction.

143. Late in 2018, Stifel altered its conduct with respect to 100% placements with Preston Hollow in response to Miller's threats, purportedly to enforce an informal

preexisting policy not to originate 100% placements.

144.    Stifel informed Preston Hollow that, after being punished by Nuveen for a large 100% placement with Preston Hollow, it promised Nuveen that it would show potential 100% placements that it originates to Nuveen first, effectively giving Nuveen a right of first refusal.

145.    The head of Stifel's municipal securities group testified that "since John Miller yelled" at him, Stifel had not "given any exclusive on deals we control."

146.    Although Stifel will still underwrite deals for Preston Hollow that Preston Hollow originates by itself (which is a small portion of Preston Hollow's business), Stifel will not originate a 100% placement for Preston Hollow.

147.    However, Stifel has done exclusive deals with investors other than Preston Hollow, and Nuveen has not complained.

I.    KeyBanc Agreed to the Boycott in the Summer of 2018

148.    Prior to December 2018, KeyBanc had completed four 100% placements with Preston Hollow.

149.    In April 2018, Davern called KeyBanc and placed it in the box—effectively ceasing to do any business with it—for a recent 100% placement with Preston Hollow.

150.    Also as a response to KeyBanc's work with Preston Hollow, Nuveen withdrew a purchase order on an $85 million issuance for which KeyBanc was acting as underwriter.

151.    Thereafter, in the summer of 2018, KeyBanc made a commitment to show Nuveen every deal, effectively giving Nuveen a right of first refusal, and after that commitment

Nuveen and KeyBanc resumed business.

152.    As a result of Nuveen's threats, KeyBanc will not originate 100%

placements with Preston Hollow without first giving Nuveen an opportunity to participate.

## VIII.   The Boycott Was a Horizontal Conspiracy

153.    The Delaware Court of Chancery found that, "as Preston Hollow was

becoming a contender in the high-yield municipal bond market, Nuveen, the self-styled 'largest

high-yield [municipal] fund in the world,' sought an industry-wide agreement not to conduct

business with Preston Hollow."

154.    The Court of Chancery further found that, "[a]lthough part of Nuveen's

motive was its interest in 'seeing all the deals,' its behavior shows that its object was also an

attack directed at Preston Hollow's ability to operate. . . . The evidence demonstrated an

aggressive and widely dispersed campaign to use almost any pressure necessary to cut off a

competitor from its chief source of business as well as its financing . . . [and] Nuveen was not

simply attempting to achieve a competitive edge; it meant to use the leverage resulting from its

size in the market to destroy Preston Hollow."

155.    The "industry-wide agreement" found by the Delaware Court of Chancery

constitutes a horizontal conspiracy, with Nuveen as the hub, which is a per se violation of the

antitrust laws.

156.    Each of the broker-dealers either was in discussions with Preston Hollow

on 100% placements, or had recently participated in 100% placements with Preston Hollow, or

was actively pitching Preston Hollow to do 100% placements prior to Miller's threats, and each

of them suddenly reversed course.

157.    The telephone recordings show that Nuveen informed the broker-dealers

that Miller was asking (or, rather, threatening) them to join in concerted action with other market

participants.  Miller did more than inform individual broker-dealers about agreements with

others; he made clear that all participants would be acting together as "partners" on his "team."

158.    As the self-styled "largest high-yield muni shop in the world," Nuveen

buys approximately 20% of municipal bond offerings and an even higher percentage of high-

yield offerings.

159.    Nuveen is one of the largest (if not the largest) business counterparties for

the boycotting broker-dealers.  It generates as much as 80 times more revenue for the broker-

dealers as Preston Hollow.

160.    Based on its market share and vital importance to the broker-dealers'

bottom line, Nuveen has the market power to coerce the broker-dealers to join the Nuveen

"team" with the other broker-dealers by boycotting Preston Hollow.

161.    The recordings also show it was important for the broker-dealers to be

assured that other broker-dealers were also participating, and that the arrangement would be

"uniform across the street."

162.    For example, both Wells Fargo and Morgan Stanley specifically asked for

and received assurances from Nuveen that all broker-dealers were complying.

163.    Nuveen made it clear in the recorded conversations that it intended to

punish any counterparty that did not comply with Nuveen's demand that they stop doing 100%

placements business with Preston Hollow.  Deutsche Bank, Goldman, and Morgan Stanley were

told specifically that they could not do business with both Preston Hollow and Nuveen.  And,

when Deutsche Bank refused to comply with Nuveen's demands, Nuveen removed $1 billion in

TOB business from Deutsche Bank.  The existence of a system of rewards and punishment to

29

enforce the boycott is also evidence of a horizontal agreement.

164.     Deutsche Bank was told by Hlavin that if it did not join the boycott it would be easy for Nuveen to cut off ties since Deutsche Bank would be only one of two nonparticipants in the boycott.  Hlavin told Deutsche Bank, "the fact that so many have done it [*i.e.*, agreed to the boycott], it just makes it easier for us to -- to not do business with counterparties who can't make that certification right now."  This degree of coordination and assurance of market uniformity by Nuveen is the hallmark of a horizontal agreement.

165.     Nuveen also put in place a structure for policing and reporting "cheating" by broker-dealers.  For example, in December 2018, when threatened with being put in the box by Nuveen because it had served as underwriter for a transaction with Howard University that closed in November 2018 (the "Howard Center" transaction), Bank of America reported to Nuveen that Morgan Stanley was working on a 100% placement with Preston Hollow. Similarly, RBC reported a violation of the boycott by Stifel.  The reinforcing nature of the punishment strategy, where the potential to recapture rival broker-dealer business with Nuveen is present when a noncompliant member is placed in the "box," creates strong incentives for participants both to identify cheaters and to remain compliant themselves.

## IX.   Miller, and Others Acting at His Direction, Knowingly or Recklessly Made False, Defamatory Statements about Preston Hollow to Induce Broker-Dealers to Join the Boycott

166.     The telephone recordings reveal that Miller, and Hlavin and Davern acting at Miller's explicit direction, supplemented their threats of retaliation for doing business with Preston Hollow with numerous false statements to broker-dealers about Preston Hollow, all intended to procure the broker-dealers' agreement to the boycott.

167.     These false statements were either intentionally false or manifested reckless disregard for the truth in order to harm Preston Hollow's business.

168.     These false statements were independently harmful to Preston Hollow because, among other things, they allowed Nuveen's allies within the various broker-dealers to justify their refusal to engage in 100% placements with Preston Hollow.

A.   <u>Miller Falsely Told Broker-Dealers that Preston Hollow Lied to Borrowers</u>

169.     During his December 20, 2018 call with Deutsche Bank, Hlavin told Deutsche Bank that Preston Hollow was "just sitting in front of issuers lying to them. I mean, what they told Roosevelt University in front of Wells Fargo was just an outright lie and they were . . . directly bashing Nuveen to the issuer."

170.     On January 10, 2019, Hlavin again told Deutsche Bank that Preston Hollow was "lying to" borrowers and compared Preston Hollow to a salesman "knocking on your door saying: Hey, your water heater is about to break. You don't know it, but it's about to break. And if you buy insurance from me right now, I'll protect you."

171.     Hlavin lacked any good faith basis to make these statements, which are false.

172.     Miller made similar statements to broker-dealers without any good faith basis.  During his December 20, 2018 call with Goldman, Miller told Goldman that "issuers are being told things that are not true" by Preston Hollow.

173.     Miller lacked any good faith basis to make these statements, which are false.

B.   <u>Miller Falsely Told Broker-Dealers that Preston Hollow "Fleeced" Borrowers</u>

174.     On December 21, 2018, Miller falsely asserted to Deutsche Bank that Roosevelt University got "fleeced" in its transaction with Preston Hollow.

175.     Miller lacked any good faith basis for this statement.  Miller did not know

31

the circumstances of the deal, and never spoke to anyone at Roosevelt University or any other borrower about transactions with Preston Hollow.  In fact, Roosevelt University had a number of advisors and counsel involved on its behalf, and its CFO has stated under oath that Roosevelt obtained the best possible terms from Preston Hollow.

        C.   <u>Miller Falsely Told Broker-Dealers that Preston Hollow Engages in Predatory Lending</u>

176.    Within Nuveen, "predatory lending" is understood to mean "taking advantage of an unsophisticated borrower."

177.    On December 20, 2018, Hlavin repeatedly told Deutsche Bank that Preston Hollow engaged in "predatory lending."

178.    On January 10, 2019, Hlavin again repeatedly asserted to Deutsche Bank that Preston Hollow has engaged in "predatory" lending practices.

179.    On December 21, Miller told Deutsche Bank that there were problems with Preston Hollow's deals "because of the predatory nature of the way in which they're pitched and prepackaged between Preston and the issuer."  He also accused Deutsche Bank of providing Preston Hollow with the money that enabled predatory lending practices.

180.    Miller also described Preston Hollow as "predatory" during his December 20, 2018 call with Goldman.  Miller told Goldman that issuers were falling for Preston Hollow's "predatory practices" after being subjected to "predatory sales pitch[es]."

181.    Miller has stated under oath that "predatory" meant preying on unsophisticated borrowers.

182.    The statements that Preston Hollow engaged in predatory lending practices were false and made without any good faith basis.

183.    Neither Miller, Hlavin, nor anyone else at Nuveen had (i) reviewed

32

transaction documents for Preston Hollow deals, (ii) spoken to Preston Hollow borrowers, or (iii) had any reliable factual information regarding the negotiations of those deals, although all of this information was available.  They knew that high yields were not an indication of "predatory" lending, since Nuveen also regularly engages in municipal bond transactions in which the yields are equal to or higher than the yields on Preston Hollow transactions.

    D. <u>Miller Falsely Claimed that Preston Hollow Deals Were "Rushed" and "Covenant-light"</u>

  184. On January 10, 2019, Hlavin told Deutsche Bank that Preston Hollow would weaken or remove important covenants from the documents governing its transactions, creating securities that are bad for the municipal bond market.  During his call with Goldman, Miller said that Preston Hollow would "rush the issuer into" transactions that were "covenant light, no covenant, whatever."

  185. During the December 21, 2018 call with Deutsche Bank, Miller said that broker-dealers "rushed" Preston Hollow deals through without being evaluated.

  186. These statements were false and made without any good faith basis.

  187. Neither Miller nor Hlavin reviewed the transaction documents of Preston Hollow deals and they had no knowledge of the covenants in the transactions.  When asked under oath, they were unable to identify a single transaction in which the issuer was rushed.  In particular, although Miller told broker-dealers that Preston Hollow had rushed Roosevelt University through a transaction, the timeline for the Roosevelt University Bonds was driven by Roosevelt University's need to secure funding before its fiscal year ended and not by Preston Hollow.  Miller knew or should have known this since Nuveen was a holder of Roosevelt University's outstanding bonds.

E.   <u>Miller Falsely Asserted that It Had Evidence of Preston Hollow's Purported</u>
<u>Misconduct</u>

188.    When discussing Preston Hollow with Goldman on December 20, 2018,
Miller claimed that "there were some unethical practices that have caught the attention of the
states' attorney generals, [who] in some cases, have written nastygrams to Preston Hollow saying
Don't come into my town again."

189.    In fact, no single attorney general, much less multiple "states' attorney
generals," ever investigated or threatened Preston Hollow.

190.    Miller knew his statement was false at the time and nevertheless made the
statement to Goldman in order to injure Preston Hollow.

191.    Miller also told Goldman that "we do have a lot of evidence" to support
his statements about Preston Hollow's purported lies to issuers and predatory conduct.  That was
false, and Miller knew Nuveen had no such "evidence."

192.    Hlavin similarly told Deutsche Bank that, "[w]e have direct evidence
they're lying to them [*i.e.*, borrowers]."  That was false; Hlavin has admitted that Nuveen had no
such "direct evidence."

F.   <u>Miller Made Similar Defamatory Statements to Other Broker-Dealers</u>

193.    Audio recordings exist for only a fraction of the calls Miller or his
subordinates acting at his direction made to municipal market participants in 2018 and early
2019.  However, the similarities and repeated statements, phrases and themes used by Miller to
disparage Preston Hollow in the recorded calls reflect a pattern of defamatory conduct that Miller
engaged in with other broker-dealers.

194.    For example, emails reveal that in an unrecorded call with Bank of
America where Miller intended to persuade Bank of America not to do 100% placements with

Preston Hollow, Miller "dumped two years of research" on Bank of America.

195.    The "two years of research" refers to the same false and defamatory statements about Preston Hollow that Miller made contemporaneously to Deutsche Bank, Goldman, and other broker-dealers.

196.    Indeed, Vice Chancellor Glasscock found that "the evidence leads [the Court] to believe" that communications with other broker-dealers JPMorgan, KeyBanc, Mesirow, Stifel, and Wells Fargo that were not recorded, "were part of the same pattern of conduct intended to end these broker-dealers' relationships with Preston Hollow."

## X.    Nuveen Refuses to Remedy Its Misconduct

197.    On January 15, 2019, Preston Hollow sent a cease and desist letter to Nuveen demanding that Miller and Nuveen cease and desist from further unlawful and tortious communication; undertake an internal investigation to identify all persons and institutions to whom Miller and his staff have communicated regarding Preston Hollow, and the substance of those communications; communicate the findings of its internal investigations to Preston Hollow; take steps to undo the harm already caused by Miller's unlawful conduct; and agree to adopt supervisory procedures to ensure that Nuveen representatives do not engage in similar misconduct in the future.

198.    More than five weeks later, on February 22, 2019, Nuveen's head of Legal issued a letter to the legal department at each of the firms Preston Hollow had identified as having received threats from Miller.  Nuveen's letter did not admit Miller's threats, but in carefully chosen phrases acknowledged that "recent business discussions" between Nuveen and trading personnel of the various firms "may have included discussion of the firm [Preston Hollow] and some of its municipal finance investments."  The letter purports to disavow any

"agreement or commitment from your firm regarding Preston Hollow," but fails to retract any of its previous threats or false statements about Preston Hollow.  Far from mitigating the harm done, Nuveen boldly reminds these firms of its power to make good on Miller's anticompetitive threats in the letter's penultimate sentence: "*Of course, Nuveen reserves the right to conduct its trading business with firms within its lawful discretion and to hold and express its views and judgments in pursuing its investment advisory and trading activities*."

199.    Nuveen's letters were intended as, and were construed by the broker-dealers as, a reaffirmation and not a disavowal of Miller's threats.

200.    Following receipt of Nuveen's February 22, 2019 letters, no broker-dealer reversed its decision not to engage in 100% placements with Preston Hollow.

## XI.    Defendants' Unlawful Conduct Harmed Preston Hollow

201.    Nuveen's unlawful campaign of threats and slander against Preston Hollow has had its intended effect; it has resulted in substantial economic harm to Preston Hollow.  Most of the leading broker-dealers in the industry either have ceased working with Preston Hollow on 100% placements or will do so only if Preston Hollow originates the transactions.

202.    Prior to Miller's threats beginning in December 2018, Bank of America, Goldman, and JPMorgan all expressed interest in participating as underwriter for the Howard Quad Transaction.  Following Miller's threats, none of the three – nor any other top tier or "bulge bracket" broker-dealer – would agree to be the underwriter.  Preston Hollow was forced to work with a less prestigious underwriter with less capital, adversely impacting the value and liquidity of the bonds.

203.    As of January 2019, Preston Hollow was engaged in discussions with

Goldman regarding twelve different transactions and Goldman viewed Preston Hollow as an important part of its business plan going forward. Since Nuveen's misconduct, however, all discussions with Goldman regarding those twelve transactions ceased and Preston Hollow is no longer working with Goldman on 100% placements.

204.    More generally, Preston Hollow has seen a drastic reduction in inquiries and interaction with broker-dealers beginning in January 2019 as a result of Nuveen's tortious conduct.

205.    In fact, immediately following Miller's threats in late December 2018, contacts and inquiries from broker-dealers about potential deals trailed off drastically, which resulted in a massive decline in originations, causing Preston Hollow to fall well short of its budgeted originations for 2019.

206.    Despite tight supply of municipal bonds since its founding in 2014 and strong competition (from Nuveen and others) to buy new issuances of municipal bonds, Preston Hollow successfully grew its municipal bond portfolio since its inception from $110 million to approximately $1.7 billion by the end of 2018. Preston Hollow's origination of new municipal bond transactions grew by 39% from 2016 to 2017 and 34% from 2017 to 2018. Accordingly, the decline in Preston Hollow's origination of new municipal bond transactions is directly attributable to Nuveen's misconduct.

207.    The impact of Defendants' unlawful use of coercion and slander to organize a boycott of Preston Hollow has severely curtailed Preston Hollow's ability to originate and execute new municipal bond transactions. Defendants' conduct was intended to cause, and has caused, Preston Hollow to suffer substantial damages, including but not limited to lost profits, and such damages likely will continue into the future. The economic injury Preston

Hollow has suffered, and will suffer, exceeds $100 million before trebling.

## XII.    The Boycott Harms Competition

208.    Preston Hollow is an innovator in the high-yield municipal finance space. With its permanent capital base and deep bench of municipal finance bankers, lawyers, credit analysts, and financial engineers who review, analyze, and structure municipal transactions, Preston Hollow is able to provide a wide array of custom features to tailor investments to the specific needs of particular borrowers, typically through 100% placements.

209.    There are very few, if any, other participants in the high-yield municipal market that have Preston Hollow's ability and resources and provide the complete package of customized financing solutions that Preston Hollow provides.

210.    Preston Hollow's market performance, detailed above, provides objective, economic evidence of its unique value to borrowers.

211.    Nuveen's witnesses testified that their statements to the various market counterparties were not limited to Preston Hollow but were intended to prevent broker-dealers from engaging in 100% placements with any lender.  The Court of Chancery found this testimony to be disingenuous, as Preston Hollow was the only lender engaging in 100% placements as part of its core business strategy.  Nevertheless, Nuveen has made clear its intent to use its market power to prevent borrowers from doing business with any lender offering the same kind of innovative, bespoke services as Preston Hollow or other alternatives to traditional public offerings.

212.    The Court of Chancery also recognized that "[i]ssuing bonds to a single investor can offer advantages in terms of financing flexibility, which makes 100% placements attractive to certain issuers. On the other hand, because a single investor in a 100% placement

purchases all the bonds, such a transaction may lack the same degree of competitive market check a wider issuance would enjoy."

213.   The leading broker-dealers participating in the boycott, including the "bulge-bracket" broker-dealers, act as gatekeepers between municipal borrowers and their financial advisors, on the one hand, and providers of financing capital, on the other hand.  The broker-dealers act as intermediaries and assist in facilitating the issuance of the bonds through a traditional public offering.  But they also can provide value to their municipal borrower clients by making them aware of alternatives to a traditional public offering, like the services offered by Preston Hollow, of which the municipal borrowers and their financial advisors may not be aware.

214.   For example, prior to joining Nuveen's boycott, Wells Fargo – acting as broker-dealer – suggested Preston Hollow to Roosevelt University.  Neither Roosevelt University nor its other financial advisors had been able to identify any other solution for Roosevelt University's financial needs.

215.   The leading broker-dealers serve as lead underwriter for the large majority by volume of all municipal issuance generally and of all high-yield municipal issuance in particular.  Because of the boycotting broker-dealers' gatekeeper role and their market power, Preston Hollow, or other innovators that may seek to provide alternatives to a traditional public offering, has a materially restricted channel through which to offer its services to municipal borrowers.  And the substantial number of municipal borrowers who are represented by the leading broker-dealer firms year in and year out are completely foreclosed from innovative financing alternatives through Preston Hollow – and anyone else who would pursue a similar business model – by virtue of the boycott.

216.   The boycott organized by Nuveen harms competition among lenders in

primary high-yield municipal bond offerings by depriving the borrower clients of the boycotting broker-dealers of the *option* of choosing Preston Hollow's innovative, customized services rather than a traditional high-yield public offering.

217.   Preston Hollow may not be the right option for all borrowers.  Some borrowers require less tailoring or flexibility and would prefer a traditional public offering to ensure the lowest possible interest rate.  For other borrowers, like Roosevelt University, achieving the lowest possible interest rate is secondary to the requirement of speed, flexibility, and certainty of execution that only Preston Hollow can provide.

218.   For borrowers for which a traditional public offering is unavailable or infeasible due to, among other things, the need to reduce execution and interest rate risk by obtaining a financing commitment early in the process or securing a forward sale, the need for customized, taxable interim financing, the need for a drawdown structure or other flexible structures not found in the capital markets, the extended time required to obtain ratings and bring the bonds to market, the desire to deliver final offering documents after bonds are sold, or the desire to deal with a single lender for maximum post-closing flexibility, the boycott organized by Nuveen will prevent those borrowers from accessing the financing they need.

219.   Borrowers, together with their advisors, should determine what type of offering is in their best interest and should be free to obtain financing from the lender of their choice.  Nuveen has taken that decision out of their hands by coercing broker-dealers to deprive borrowers of the choice.

220.   The competitive harm here is particularly virulent because it is aimed at discouraging innovation in the market to benefit an entrenched market participant (and, indeed, arguably the most powerful player in the market).  By stymieing the ability of an innovative

market disruptor like Preston Hollow to compete, Nuveen also discourages other potential innovators from entering the market, to the detriment of borrowers.  Left unchecked, Miller and Nuveen will be emboldened to similarly attack other, smaller competitors to the detriment of the municipal markets as a whole, further harming borrowers.

221.    The boycott organized by Nuveen also prevents competition among broker-dealers to provide underwriting services for Preston Hollow's 100% placements.

## XIII.   There Is No Procompetitive Justification for Nuveen's Conduct

222.    There is no procompetitive justification for Nuveen's conduct.  As the Court of Chancery held, Nuveen's intent was to destroy a competitor and to benefit itself.

223.    The only justification previously offered by Nuveen is that Preston Hollow engaged in so-called "predatory" conduct with Howard University and Roosevelt University and Nuveen was purportedly trying to protect borrowers.  That is false.  Both Howard University and Roosevelt University are sophisticated borrowers, represented by experienced legal and financial advisors.  And both are very satisfied customers, engaging in repeat business with Preston Hollow.  The CFO of Roosevelt University even volunteered to testify on Preston Hollow's behalf in the Court of Chancery.

224.    Regardless, a restraint of trade that purports to "protect" consumers from purportedly harmful competitors by reducing consumer choice is inherently anticompetitive. The type of "marketplace vigilantism" that Nuveen purports to have been engaged in fails as a matter of law to qualify as a procompetitive justification.

## RELEVANT MARKET

225.    The relevant product market is the market to provide financing to borrowers via high-yield municipal bond offerings.

226.    The relevant geographic market is the nationwide market to provide financing to borrowers via high-yield municipal bond offerings.

227.    The high-yield municipal bond market is distinct from the market for investment grade municipal bonds.

228.    High-yield bonds typically offer higher yields than investment grade bonds with similar maturities because they are considered more vulnerable to the possibility of default or bankruptcy, illiquidity, and increased market price volatility, and in most cases are not suitable for most retail investors.

229.    The investment grade municipal market largely consists of high-quality general obligation bonds (*i.e.*, bonds backed by the full faith and credit of the issuing entity). The high-yield municipal market, in contrast, consists of a combination of different types of bonds that do not qualify as investment grade.  These are mainly project revenue bonds issued to finance such projects as student housing, hospitals, assisted living facilities, continuing care retirement communities, nursing homes, multi-family housing, toll roads, industrial development, charter schools, environmental projects and pollution control, land development/special assessment ("dirt bonds"), miscellaneous revenue bonds (*e.g.*, casino/gaming), some tobacco bonds, and various defaulted bonds (for example, certain Puerto Rico bonds).

230.    In other words, high-yield municipal bonds are typically bonds that provide an element of essential service that is financially independent from the city, county, state, or other entity they serve.

231.    Whereas investment grade municipal bond investors consider the financial stability of the issuing entity – whether it can balance its budget, its pension obligations, its long-

term health care costs, etc. – high-yield municipal bond investors typically pay close attention to the project's economics and competitive position, as well as security features such as revenue pledges, mortgage liens, or other security interests.

232.    Issuers of high-yield debt also may be newer to the marketplace, and investors require an extra premium to purchase their bonds.

233.    Regardless of the nature of the issuance, high-yield issuances are all characterized by the absence of investment grade credit ratings. Municipal borrowers cannot choose to participate in the investment grade municipal bond market unless they are capable of achieving a high rating from one or more of the nationally recognized statistical rating organizations. Municipal borrowers that seek long-term financing but are unable to achieve an investment grade rating therefore have no choice but to turn to the high-yield municipal bond market.

234.    There are no reasonable substitutes to obtaining financing through high-yield municipal bond offerings available to high-yield municipal borrowers because, among other things, investors are generally unwilling to provide financing at interest rates acceptable to such borrowers without the liquidity and tax-exempt yield associated with high-yield municipal bonds.

235.    There are no reasonable substitutes to investing in high-yield municipal bond offerings available to Preston Hollow because, among other things: (i) Preston Hollow is a differentiated business that was organized and staffed specifically to analyze and underwrite municipal risks in accordance with its business plan; and (ii) it would not be reasonable for Preston Hollow to devote all or a substantial part of its business to investment grade municipal financing, or to taxable direct lending to high-yield municipal borrowers (to the extent such

opportunities existed), because doing so would not adequately address Preston Hollow's target

market and would not provide Preston Hollow with acceptable tax-exempt returns and liquidity

through the ability to exit through secondary market sales.

### FIRST CAUSE OF ACTION
(Sherman Act and Clayton Act – *Per Se* Violation)

236.    Preston Hollow re-alleges the allegations set forth above.

237.    The Clayton Act declares, "any person who shall be injured in his business

or property by reason of anything forbidden in the antitrust laws may sue therefor in any district

court of the United States in the district in which the defendant resides or is found or has an

agent." 15 U.S.C. § 15(a).

238.    Federal antitrust laws include the Sherman Act, which prohibits "[e]very

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

commerce among the several States." 15 U.S.C. § 1.

239.    Certain "agreements or practices, which because of their pernicious effect

on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable

and therefore illegal without elaborate inquiry as to the precise harm they have caused or the

business excuse for their use" and therefore constitute *per se* violations of the antitrust laws. *See

Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

240.    Nuveen has forced the leading broker-dealers in the high-yield municipal

bond market to enter into a horizontal boycott of 100% placements with Preston Hollow, which

constitutes a *per se* violation of the antitrust laws.

241.    Miller has contacted broker-dealers and demanded that they agreed not to

engage in, or not to originate, 100% placements with Preston Hollow. These demands include

threats communicated to broker-dealer that Nuveen will reduce or eliminate revenue

44

opportunities with broker-dealers if they engaged as a broker-dealer with Preston Hollow in future limited public offerings.

242.     Nuveen did not simply engage in separate, vertical agreements with individual broker-dealers.  The Delaware Court of Chancery found that Nuveen "sought an industry-wide agreement not to conduct business with Preston Hollow."

243.     As alleged above, the telephone recordings demonstrate that broker-dealers knew they were agreeing to participate in concerted action with other broker-dealers and to join with other broker-dealers as "partners" on Miller's "team" in an arrangement that would be "uniform across the street"; that the broker-dealers changed their conduct to cease engaging in 100% placements with Preston Hollow at approximately the same time; that Nuveen provided participants in the boycott with inducements and the threats of punishments to secure their mutual participation in the boycott; and that Nuveen encouraged boycott participants to police the conduct of the other participants to preserve the concerted nature of the conduct.

244.     Nuveen's anti-competitive conduct caused antitrust injury to Preston Hollow by significantly limiting Preston Hollow's ability to engage in its primary business – providing financing to high-yield municipal borrowers via 100% placements, as alleged more fully herein.

245.     Nuveen's anti-competitive conduct has harmed, and will continue to harm, competition in three ways: (1) by reducing borrower choice at the origination stage by preventing broker-dealers from presenting their yield to borrower clients with the option of Preston Hollow's unique services rather than a traditional public offering, leaving borrowers worse off; (2) by discouraging other potential market innovators from entering the market; and (3) by reducing competition among broker-dealers to provide underwriting services to Preston Hollow.

45

246.     Nuveen's violations of the antitrust laws have damaged Preston Hollow in an amount to be proven at trial, but not less than $100 million before trebling.

## SECOND CAUSE OF ACTION
(Sherman Act and Clayton Act – Rule of Reason)

247.     Preston Hollow re-alleges the allegations set forth above.

248.     The Clayton Act declares, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent."  15 U.S.C. § 15(a).

249.     Federal antitrust laws include the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.

250.     Nuveen's conduct in organizing the leading broker-dealers in the high-yield municipal market in a boycott of 100% placements with Preston Hollow constitutes an unreasonable restraint on competition in violation of the antitrust laws.

251.     Miller has contacted broker-dealers and demanded that they agreed not to engage in, or not to originate, 100% placements with Preston Hollow.  These demands include threats communicated to broker-dealers that Nuveen will reduce or eliminate revenue opportunities with broker-dealers if they engaged as a broker-dealer with Preston Hollow in future limited public offerings.

252.     Nuveen's anti-competitive conduct caused antitrust injury to Preston Hollow by significantly limiting Preston Hollow's ability to engage in its primary business – providing financing to high-yield municipal borrowers via 100% placements, as alleged more fully herein.

46

253.     Nuveen's anti-competitive conduct has harmed, and will continue to harm, competition in three ways: (1) by reducing borrower choice at the origination stage by preventing broker-dealers from presenting their yield to borrower clients with the option of Preston Hollow's unique services rather than a traditional public offering, leaving borrowers worse off; (2) by discouraging other potential market innovators from entering the market; and (3) by reducing competition among broker-dealers to provide underwriting services to Preston Hollow.

254.     Nuveen claims its conduct is justified because Preston Hollow allegedly engages in predatory conduct with borrowers.  That is false.

255.     In any event, Nuveen's "marketplace vigilantism" is inherently anticompetitive and fails as a matter of law to constitute a procompetitive justification.

256.     Because Nuveen's misconduct as alleged herein lacks any procompetitive justification, the Court can conclude that Nuveen's conduct constitutes an unreasonable restraint of trade through a "quick look" analysis.

257.     Nuveen's violations of the antitrust laws have damaged Preston Hollow in an amount to be proven at trial, but not less than $100 million before trebling.

### THIRD CAUSE OF ACTION
(Donnelly Act – *Per Se* Violation)

258.     Preston Hollow re-alleges the allegations set forth above.

259.     The actions by Nuveen alleged herein have an actual adverse effect on competition within the State of New York and violate the Donnelly Antitrust Act, N.Y. Gen. Bus Law. § 340, et seq. because these activities are deemed so pernicious to competition that they are per se unreasonable.

260.     The Donnelly Act declares, "[e]very contract, agreement, arrangement or combination whereby . . . [c]ompetition or the free exercise of any activity in the conduct of any

business, trade or commerce or in the furnishing of any service in this state is or may be restrained . . . to be against public policy, illegal and void."

261.    Nuveen has forced the leading broker-dealers in the high-yield municipal bond market to enter into a horizontal boycott of 100% placements with Preston Hollow, which constitutes a *per se* violation of the antitrust laws.

262.    Miller has contacted broker-dealers and demanded that they agreed not to engage in, or not to originate, 100% placements with Preston Hollow.  These demands include threats communicated to broker-dealers that Nuveen will reduce or eliminate revenue opportunities with broker-dealers if they engaged as a broker-dealer with Preston Hollow in future limited public offerings.

263.    Nuveen did not simply engage in separate, vertical agreements with individual broker-dealers.  The Delaware Court of Chancery found that Nuveen "sought an industry-wide agreement not to conduct business with Preston Hollow."

264.    As alleged above, the telephone recordings demonstrate that broker-dealers knew they were agreeing to participate in concerted action with other broker-dealers and to join with other broker-dealers as "partners" on Miller's "team" in an arrangement that would be "uniform across the street"; that the broker-dealers changed their conduct to cease engaging in 100% placements with Preston Hollow at approximately the same time; that Nuveen provided participants in the boycott with inducements and the threats of punishments to secure their mutual participation in the boycott; and that Nuveen encouraged boycott participants to police the conduct of the other participants to preserve the concerted nature of the conduct.

265.    Many of the leading broker-dealers participating in the boycott, including Wells Fargo, Goldman, Bank of America, JPMorgan, and Morgan Stanley, are located in New

York. Accordingly, Nuveen's unlawful conduct has had an actual adverse effect on competition within the State of New York.

266.    Nuveen's anti-competitive conduct caused antitrust injury to Preston Hollow by significantly limiting Preston Hollow's ability to engage in its primary business – providing financing to high-yield municipal borrowers via 100% placements, as alleged more fully herein.

267.    Nuveen's anti-competitive conduct has harmed, and will continue to harm, competition in three ways: (1) by reducing borrower choice at the origination stage by preventing broker-dealers from presenting their yield to borrower clients with the option of Preston Hollow's unique services rather than a traditional public offering, leaving borrowers worse off; (2) by discouraging other potential market innovators from entering the market; and (3) by reducing competition among broker-dealers to provide underwriting services to Preston Hollow.

268.    Nuveen's violations of the Donnelly Act have damaged Preston Hollow in an amount to be proven at trial, but not less than $100 million before trebling.

### FOURTH CAUSE OF ACTION
(Donnelly Act – Rule of Reason)

269.    Preston Hollow re-alleges the allegations set forth above.

270.    The actions by Miller and Nuveen alleged above have an actual adverse effect on competition within the State of New York and violate the Donnelly Antitrust Act, N.Y. Gen. Bus Law. § 340, et seq. because under the circumstances there is an unreasonable restraint of trade.

271.    The Donnelly Act declares, "[e]very contract, agreement, arrangement or combination whereby . . . [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be

restrained . . . to be against public policy, illegal and void."

272.    Nuveen's conduct in organizing the leading broker-dealers in the high-yield municipal market in a boycott of 100% placements with Preston Hollow constitutes an unreasonable restraint on competition in violation of the Donnelly Act.

273.    Miller has contacted broker-dealers and demanded that they agreed not to engage in, or not to originate, 100% placements with Preston Hollow.  These demands include threats communicated to broker-dealers that Nuveen will reduce or eliminate revenue opportunities with broker-dealers if they engaged as a broker-dealer with Preston Hollow in future limited public offerings.

274.    Many of the leading broker-dealers participating in the boycott, including Wells Fargo, Goldman, Bank of America, JPMorgan, and Morgan Stanley, are located in New York.  Accordingly, Nuveen's unlawful conduct has had an actual adverse effect on competition within the State of New York.

275.    Nuveen's anti-competitive conduct caused antitrust injury to Preston Hollow by significantly limiting Preston Hollow's ability to engage in its primary business – providing financing to high-yield municipal borrowers via 100% placements, as alleged more fully herein.

276.    Nuveen's anti-competitive conduct has harmed, and will continue to harm, competition in three ways: (1) by reducing borrower choice at the origination stage by preventing broker-dealers from presenting their yield to borrower clients with the option of Preston Hollow's unique services rather than a traditional public offering, leaving borrowers worse off; (2) by discouraging other potential market innovators from entering the market; and (3) by reducing competition among broker-dealers to provide underwriting services to Preston Hollow.

277.    Nuveen claims its conduct is justified because Preston Hollow allegedly engages in predatory conduct with borrowers.

278.    Nuveen's "marketplace vigilantism" is inherently anticompetitive and fails as a matter of law to constitute a procompetitive justification.

279.    Because Nuveen's misconduct as alleged herein lacks any procompetitive justification, the Court can conclude that Nuveen's conduct constitutes an unreasonable restraint of trade through a "quick look" analysis.

280.    Nuveen's violations of the Donnelly Act have damaged Preston Hollow in an amount to be proven at trial, but not less than $100 million before trebling.

## FIFTH CAUSE OF ACTION
(Tortious Interference With Prospective Business Relations Against Miller)

281.    Preston Hollow re-alleges the allegations set forth above.

282.    The Delaware Court of Chancery found that the conduct alleged herein constituted tortious interference with prospective business relations by Nuveen.

283.    The conduct alleged herein and found by the Delaware Court of Chancery to constitute tortious interference with prospective business relations was undertaken by Miller or his subordinates at Nuveen acting at Miller's direction.

284.    On information and belief, Miller's compensation at Nuveen is based, in whole or in part, on the value of assets under his management.

285.    Accordingly, the tortious conduct alleged herein was intended to provide, and did provide, a direct financial benefit to Miller.

286.    As alleged more fully herein, Preston Hollow at all relevant times had a financing relationship with Deutsche Bank and ongoing business relationships with broker-dealers, including Goldman, JPMorgan, Morgan Stanley, Bank of America, KeyBanc, Mesirow,

Stifel, and Wells Fargo.

287.    Miller, personally or by directing the actions of others, intentionally interfered with Preston Hollow's business relations with third-parties, including (without limitation) Deutsche Bank, Goldman, JPMorgan, Morgan Stanley, Bank of America, KeyBanc, Mesirow, Stifel, and Wells Fargo.

288.    In connection with that interference, Miller used wrongful means, including (without limitation), defamation, fraudulent statements, unlawful restraints of trade, and wrongful economic pressure, all as more fully alleged herein and as found by the Delaware Court of Chancery.

289.    Miller's conduct has injured Preston Hollow's business relationships with the third parties, as more fully alleged herein.

290.    Miller's tortious conduct has damaged Preston Hollow in an amount to be proven at trial, but not less than a $100 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Preston Hollow respectfully requests that this Court:

A.    Award compensatory damages in an amount to be proven at trial and treble damages in favor of Preston Hollow and against Nuveen for violations of the Sherman Act and the Clayton Act;

B.    Award compensatory damages in an amount to be proven at trial and treble damages in favor of Preston Hollow and against Nuveen for violations of the Donnelly Act;

C.    Award compensatory damages in an amount to be proven at trial in favor of Preston Hollow and against Miller for tortious interference with prospective

business relations;

D.    Award punitive damages in an amount to be proven at trial in favor of Preston
      Hollow and against Miller for tortious interference with prospective business
      relations;

E.    Award Preston Hollow its reasonable costs and expenses incurred in this action,
      including counsel fees and expert fees; and

F.    Order such other, further, and general relief as is just and proper.

## <u>JURY TRIAL DEMANDED</u>

Preston Hollow hereby demands a trial by jury on all issues triable by jury.

Date: February 14, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ David H. Wollmuth*
David H. Wollmuth
R. Scott Thompson
Michael C. Ledley
Sean P. McGonigle
Nicole C. Rende

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, New York 10110
dwollmuth@wmd-law.com
sthompson@wmd-law.com
mledley@wmd-law.com
smcgonigle@wmd-law.com
nrende@wmd-law.com

*Attorneys for Plaintiff Preston Hollow*
*Capital LLC*